**James R. BAKER, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 94–453C.**

United States Court of Federal Claims.

Dec. 12, 1995.

Barry P. Steinberg, Arlington, VA, for plaintiffs. William A. Aileo, Springville, PA of counsel.

John S. Groat, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Major Joginder Dhillion, Department of the Air Force, of counsel.

## OPINION

MILLER, Judge.

This case comes before the court on cross-motions for summary judgment. Eighty-three retired United States Air Force colonels ("plaintiffs") challenge their selection for retirement by the Fiscal Year 1992 ("FY92") Selective Early Retirement Board (the "SERB")[1] formed pursuant to 10 U.S.C. §§ 638, 638a (1994). The parties cross-moved on the following counts in the amended complaint: Count 1—alleging that the

---

1. The acronym SERB refers to the FY92 SERB unless otherwise indicated.

Department of the Air Force's (the "Air Force") SERB violated plaintiffs' constitutional right to equal protection guaranteed under the Due Process Clause of the Fifth Amendment; Count 2—that the SERB was conducted in violation of 10 U.S.C. § 277 (1988), *repealed by* Pub.L. No. 103–337, § 1661(a)(2)(A), 108 Stat. 2979 (Oct. 5, 1994) (prohibiting discrimination in laws applying to both reserves and regulars); Count 3— that the SERB was conducted in violation of 32 C.F.R. §§ 51.4–.5 (prohibiting discrimination); and Count 7—that the SERB was conducted in violation of Department of Defense ("DOD") Directive 1332.32 (Jan. 22, 1982) (requiring Air Force to use centralized boards to process reports for SERB). Defendant moved for summary judgment on the remaining three counts: Count 4—alleging that the SERB was conducted in violation of 10 U.S.C. § 638(e)(2)(B)(i) (exempting from consideration by the SERB officers retired pursuant to 10 U.S.C. § 8911 (1994)); Count 5—alleging that the SERB was conducted in an arbitrary and capricious manner because of a series of misleading Air Force actions; and Count 6—that the SERB was conducted in violation of DOD Directive 1332.32, ¶ D (requiring involuntary early retirement of Air Force colonels be done sparingly).

### FACTS

The following facts are undisputed, except where noted. Congress created the selective early retirement process to downsize the armed forces in an orderly and equitable manner. Under the early retirement system, "[a] regular officer on the active-duty list of the Army, Navy, Air Force, or Marine Corps may be considered for selective early retirement by a selection board convened under section 611(b) of this title...." 10 U.S.C. § 638(a)(1) (1994). Section 611(b) states: "[T]he Secretary of Defense, the Secretary of the military department concerned, whenever the needs of the service require, may convene selection boards to recommend officers ... for early retirement...." Section 612(a)(1) states: "A selection board shall consist of five or more officers who are on the active-duty list of the same armed force as the officers under consideration by the board."

In August 1991 the Secretary of the Air Force (the "Secretary") developed a plan to reduce the number of colonels on active duty as part of a congressionally-directed force reduction that projected the Air Force to shrink in size from 486,800 active duty personnel to 437,200 by FY95. On August 2, 1991, in order to comply with this force reduction, the Secretary determined that it was necessary to convene a Colonel SERB to reduce the number of active duty colonels. *See* 10 U.S.C. §§ 611–13. In order to ensure that junior officers would not be impacted disproportionally by the SERB, the Air Force was required to reduce the retirement-eligible population of officers to FY95 levels before forcing other officers to be involuntarily retired through the SERB. The Secretary determined that the SERB would select 30 percent of eligible colonels for involuntary retirement in order to meet reduction in force requirements.

In September 1991 the Air Force sent a message to all commands that a SERB would convene on January 6, 1992. The Air Force also announced that 1) the SERB would consider for early retirement all colonels who had served at least two years of active duty as of October 31, 1991, and whose names were not on a list of officers recommended for promotion; and 2) a certain number of colonels, not to exceed 30 percent of the total potential pool of eligible officers, would be retired as a result of the SERB process. *See* 10 U.S.C. § 638(a)(2). On October 10, 1991, Deputy Chief of Staff for Personnel Gen. Billy J. Boles advised Air Force Personnel worldwide of the SERB and noted: "Legislation is pending that would make officers with a mandatory or voluntary retirement in FY92 ineligible for the SERB." On November 8, 1991, Maj. Gen. John E. Jackson, Jr., Commander of the Air Force Military Personnel Center (the "AFMPC"), sent an informational package to all officers eligible for the SERB, explaining the procedures the SERB would follow along with six pages of commonly asked questions and answers.

On December 5, 1991, Congress, through title V § 503(a) of the National Defense Authorization Act for Fiscal Years 1992 and

1993, Pub.L. No. 102–190, 105 Stat. 1290, 1355 (1991) (codified at 10 U.S.C. § 638(e)(2)(B)(i)), excluded from consideration by the SERB any officer "who has been approved for voluntary retirement under section 3911, 6323, or 8911 of this title, or who is to be involuntarily retired under any provision of law during the fiscal year in which the selection board is convened or during the following fiscal year." [2] On December 6, 1991, the AFMPC transmitted a message to Air Force personnel worldwide informing them of these provisions stating: "[O]fficers with an approved voluntary or a mandatory retirement from 1 February 1992 thru 1 September 1993, as of board convening date, will not be considered by the 6 Jan 92 SERB." On December 9, 1991, a proposal was made to the Air Force Chief of Staff, among others, to expand the retirement application time for SERB eligible officers allowing for "an exception to current AF [Air Force] policy which limits retirement projection to 12 months. It extends that window by two months so SERB eligible officers can benefit from the expected Jan 93 pay raise (*i.e.*, apply in Dec 1991 for retirement NLT [not later than] 1 Feb 93)." The purpose of this proposal was to make it possible for officers to apply for voluntary retirement early, so that they would not be forced to wait until January 1, 1992 (only six days before the SERB) to apply in order to take advantage of the 1993 pay raise. The proposal was approved on December 12, 1991, and on December 16, 1991, the AFMPC notified Air Force units worldwide of the new policy and directed personnel officers to "ensure this exception to policy receives widest possible dissemination."

In order to implement the SERB, on November 12, 1991, the Secretary approved 1) the "Retention Recommendation Form" (Air Force Form 3538) to be completed by officers in chain of command to recommend "retain" or "separate/retire" for each SERB-eligible colonel, and 2) the "Formal Charge" (the "Charge"), instructions used to guide the SERB's selections.

A Retention Recommendation Form is completed for each officer under consideration by the SERB and asks an officer's "senior rater" to comment on that officer's performance of his duties.[3] In its general instruction, the form states: "Evaluators should consider such factors as job performance, professional qualities, leadership, depth and breath of experience, job responsibility, academic and professional education, specific achievements, and future utilization of the member." In addition to comments from the senior rater, section VII of the form, which allows for a second evaluation of the officer, "is normally completed by the head of the management level or a designated representative who must be a general officer or civilian equivalent." The "Instructions For Completing AF [Air Force] Form 3538 For SERB" further state:

a. The head of management level or designated representative marks the appropriate box to concur/nonconcur with the senior rater's recommendation in block V [the senior rater's recommendation on whether to retain or retire the officer]. The head of the management level may comment only when he or she nonconcurs with the recommendation in block V (and in that situation, must comment).

b. If the head of the Mgt Level or designated representative mark Nonconcur, he or she gives a copy of the form to the ratee. If head of the Mgt Level, or designated representative, nonconcur with the senior rater and recommends retirement, he or she attaches a letter reminding the officer of his or [sic] right to submit a letter to the SERB President. . . .

---

2. Sections 3911, 6323, and 8911 enable the Army, Navy, and Air Force, respectively, to retire military personnel after 20 years of service if at least 10 years of that service was served as a commissioned officer. *See* 10 U.S.C. §§ 3911, 6323, 8911 (1994).

3. This form is one of several documents included in an officer's "Selection Folder" of materials reviewed by the SERB. Some of the other materials in the Selection Folder include: performance/effectiveness/training reports, citations for decorations, a photograph, Article 15/court martial information, selection brief, Air Force form 11, a letter to the board president, and a PME declination.

The Charge to the SERB states: "The purpose of the [SERB] is to select eligible line lieutenant colonels and colonels ... for early retirement." The "Method of Selection" instructs members of the SERB that "[y]ou must use the best-qualified method to align the officers in a relative order of merit. There is no single factor which determines your score in evaluating the eligible officers. You will use the whole person concept to subjectively assess each officer's relative potential to continue productive service on active duty." The Charge notes that the factors that should be considered include "professional competence, job performance, leadership, breath and depth of experience, job responsibility, academic and professional education, and specific achievements." The section of the Charge establishing the criteria to be applied in considering women and minorities reads:

> Your evaluation of minority and women officers must clearly afford them fair and equitable consideration. Equal opportunity for all officers is an essential element of our selection system. In your evaluation of the records of minority officers and women officers, you should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization policies or practices, may have placed these officers at a disadvantage from a total career perspective. The board shall prepare for review by the Secretary and the Chief of Staff, a report of minority and female officer selections as compared to the selection rates for all officers considered by the board.[4]

The pertinent section of the Charge dealing with officers in security assistance and attache training reads:

> To meet Air Force command, leadership, and professional supervisory and technical requirements, officers with both highly specialized and more generalized skills and experience are needed. (In addition, you should give particular consideration to officers in training for unusually hard-to-fill requirements in security assistance and the defense attache system.) The Air Force is relying on your experience and mature judgment to relate all these factors in your subjective evaluation and to retain only those officers who should remain on active duty.[5]

The SERB convened at Randolph Air Force Base, Texas, on January 6, 1992, and adjourned on January 15, 1992.[6] After concluding its deliberations, the SERB selected 29.2 percent of the pool of eligible colonels for early retirement, i.e., 610 out of 2,086 officers.[7] Overall, 93 of the 2,086 colonels under consideration by the SERB were

---

4. An undated preliminary draft of the revised Charge read:

> The goal for this selection board is to achieve a percentage of minority and female selections from in the promotion zone at a rate not less than the selection rate for the total number of officers in the promotion zone. Prior to adjournment, the board must review the extent to which this goal has been met and explain reasons for not meeting this goal.

A Staff Summary Sheet dated June 8, 1990, deleted this language and substituted the language: "You should be aware that it is possible that past personal and institutional discrimination may have disadvantaged minority and female officers. Take these factors into consideration in ensuring these officers receive truly fair and equitable treatment." A June 25, 1990 legal review of this revision questioned its legality, opining:

> In order to properly implement this direction, board members would be required to look behind the ratings, assignments, and PME history of each minority/female officer under consideration.... If, as a result of this speculation the board member felt that the record was affected by discrimination, etc., then the member would be required to do equity and revise upward the score on the record. This is a complete and categorical reversal of the long held/mandated requirement for objective evaluation of promotion records.

After additional revisions, the final draft of the Charge section dealing with women and minorities was completed on July 13, 1990.

5. Attache and security assistance officers serve as part of embassy diplomatic staff and report on matters of official interest to the Air Force.

6. The SERB included three separate boards, one each for line colonels, judge advocates colonels, and chaplain colonels. Because of the relatively large number of line officers being evaluated by the SERB, that board was comprised of ten officers divided into two panels of five officers. The other two boards were comprised of a single panel of five officers.

7. This number includes line colonels, chaplain colonels, and judge advocate colonels.

members of a minority group and/or women.[8] Of those 93, 28, or 30.1 percent, were selected for early retirement. No female officers were chosen for early retirement. Lt. Gen. John E. Jaquish, who served as president of the SERB, submitted a declaration explaining the SERB's procedures: [9]

> The procedures the SERB followed were relatively simple. The SERB reviewed all of the records and scored on a scale of 6 (lowest in potential) to 10 (absolutely superior) in increments of one-half point.... Where any two scores awarded to a given record differed by more than one and a half points, the difference was considered to be significant and the panel reviewed the record to resolve the difference to no more than one and a half points.

Declaration of Lt. Gen. John E. Jaquish, (undated) at 3.[10] Upon completion of the selection process, members of the SERB certified the board proceedings to the Secretary in a letter signed on January 13, 1992, by Lt. Gen. Jaquish, the 10 SERB voting members, and 17 staff personnel. On August 10, 1994, defendant filed this letter, included in the Force Reduction Branch Records as part of the administrative record submitted to the court. It reads, in pertinent part:

> With your guidance concerning minorities and women specifically in mind, the board thoroughly reviewed the records of all minority and woman officers eligible for selective early retirement. The retention rates for blacks and women were better than the overall board average. The retention rate for hispanic officers was below the board average. To ensure each minority and woman officer received fair and equitable consideration, the board president carefully reviewed their records and the scoring results. Where there was any doubt as to the competeness [sic] of an officer, he caused the record to be rescored

to resolve the doubt. It is the judgement of the board president and the members of the board that those officers recommended for retention are the best qualified officers.

Speaking to the issue of the treatment of minority and women officers by the SERB, Lt. Gen. Jaquish later explained: "I did not receive any guidance regarding the fair and equitable treatment of women and minority officers, other than that which was included in the formal charge.... I did not believe the charge required me to identify and afford any special preference to officers based upon their racial or ethnic background." Jaquish Decl. at 3. He further stated: "I did not construe the charge to require that the SERB produce any particular outcome with regard to the ultimate selection rates of women and minority officers." *Id.* at 2. In addition, he commented:

> At some point near the end of the proceedings, but before the scoring was completed, the administrative staff provided me with preliminary statistics concerning the selection rates of women and minority officers. The statistics were not provided to, or otherwise brought to the attention of, the board members. This information did not affect in any way the SERB's deliberations and no records were rescored based upon this information. As I was satisfied that the process was fair and the members had adhered to their oath and the Secretary's guidance, I did not take any action based on any resulting statistical disparities among the reported categories of women and minority officers or between those groups and the overall board selection rate.
>
> ....
>
> I did carefully, although selectively, review the records and scoring results. I was satisfied that the members were fairly evaluating the records. I was confident

---

8. Women accounted for 0.62 percent of the total colonels considered by the SERB.

9. The president of the SERB is a nonvoting member of the board who oversees the board process.

10. Defendant objected to the scope of discovery allowed by the court. This declaration, however, was not offered to explain anything that plaintiffs

had obtained through the disputed scope of discovery; rather, the declaration sought to explain the final report of the SERB, a document contained in the administrative record that defendant filed with the court. By order entered on August 11, 1995, the court denied plaintiffs' motion to strike this declaration. *See Baker v. United States,* 33 Fed.Cl. 810 (1995).

that the procedures the SERB implemented ... identified the best qualified officers.... I never had reason [with the exception of one unrelated case] to cause a specific record to be rescored to remove doubt about the particular officer's competitiveness....

I did not actually draft the specific language contained in the letter to the Secretary [of January 13, 1992]. I signed the draft letter the administrative staff prepared, because the draft appeared to be a fair description of the proceedings. In hindsight, other words might have more precisely portrayed the SERB's deliberations.

*Id.* at 6–7. Defendant also offered the declaration of Lt. Col. James L. Wilson, Jr., who served during the period in issue as Chief of Operations, Selection Board Secretariat, Air Force Military Personnel Center, Randolph Air Force Base, Texas, who explained that the above-quoted paragraph from the January 13, 1992 SERB board report was used only for promotion boards prior to 1992:

With respect to the CY92 SERB, the language in paragraph 5 of the report of board proceedings was identical to that which had been developed for promotion boards. Unfortunately, although it [the Jan. 13, 1992 report] is technically accurate, it is *particularly* misleading in the context of a SERB. When a record is returned for rescoring in promotion boards, the President will typically send the record to a panel which has not reviewed it. Because the procedures involved in a SERB required both panels to review all of the records which were being recommended for early retirement, there was rarely any reason to rescore a record. In the CY92 SERB, to the best of my recollection, only one record, that of a former Prisoner of War, was individually selected for rescoring.

Declaration of Lt. Col. James L. Wilson, Jr., (undated), at 2–3.

Plaintiffs are among the 610 colonels chosen by the SERB for involuntary early retirement. On July 13, 1994, plaintiffs filed a Preliminary Complaint in the Court of Federal Claims pursuant to RCFC 27(A) and moved for leave to conduct discovery, alleging that the Charge and the actions of the SERB violated their constitutional rights, applicable statutes, and regulations. In an order entered on September 23, 1994, the court required defendant to answer specified interrogatories that concerned "issues surrounding the 'Formal Charge' and information considered by the SERB in carrying out that charge" to enable plaintiffs to gather sufficient information to state their complaint with the requisite particularity. On February 14, 1995, plaintiffs amended their complaint pursuant to RCFC 27(a)(3), seeking the return of plaintiffs to active duty with backpay, retirement benefits, correction of military records and, that those eligible for 20 year retirement, be retired with full benefits from their mandatory retirement date. The complaint was amended again on September 14, 1995, pursuant to a joint motion, plaintiffs having represented that the limited discovery and defendant's response to their motion on partial summary judgment disclosed additional bases for relief. The additional five counts are not the subject of these cross-motions.

## DISCUSSION

*1. Standard of review*

■ The United States Constitution grants the President, as chief executive, the position of "Commander in Chief" of the United States Military. U.S. CONST. art. II § 2. In addition, the Constitution gives Congress "an explicit grant of plenary authority ... '[t]o make Rules for the Government and Regulation of the land and naval Forces.'" *Chappell v. Wallace,* 462 U.S. 296, 301, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983) (quoting U.S. CONST. art. I § 8). Consequently, "judges are not given the task of running the [military].... The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate ... [military] matters as the [military] must be scrupulous not to intervene in judicial matters." *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 539–40, 97 L.Ed. 842 (1953). Thus, decisions by Congress and the

Executive regarding the needs of the military must be accorded considerable deference. *See, e.g., Goldman v. Weinberger,* 475 U.S. 503, 507–08, 106 S.Ct. 1310, 1313–14, 89 L.Ed.2d 478 (1986).

■■■ Congress charged the DOD with responsibility to oversee the selective early retirement process. *See* 10 U.S.C. §§ 638, 638a. Pursuant to this grant of authority, the DOD issued a directive governing the procedures for the "Selective Early Retirement of Regular Commissioned Officers on the Active Duty List." *See* DOD Directive 1332.32 (Jan. 22, 1982). When an agency acts pursuant to its own procedures "[i]t is well established 'that an agency's construction of its own regulations is entitled to substantial deference.'" *Martin v. OSHRC,* 499 U.S. 144, 150, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117 (1991) (quoting *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986)). Judicial review of military personnel decisions is limited, because "[n]o court is in a position to resolve and pass upon the highly complicated questions and problems involved in the promotion procedure, which includes, but is not limited to, an analysis of the fitness reports and personnel files and qualifications of all the officers considered." *Brenner v. United States,* 202 Ct. Cl. 678, 694, 1973 WL 21354 (1973), *cert. denied,* 419 U.S. 831, 95 S.Ct. 54, 42 L.Ed.2d 56 (1974). This admonition applies, as well, to the retirement procedure. Plaintiffs also must "overcome the strong, but rebuttable, presumption that administrators of the military, like other public officials, discharge their duties correctly, lawfully, and in good faith." *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 813–4 (1979); *see also Bockoven v. United States, [Bockoven v. Marsh]* 727 F.2d 1558 (Fed.Cir.), *cert. denied* 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984).

■■■ Thorough judicial review, however, is appropriate of challenges to the composition and procedures followed by a selection board. *See, e.g., Sargisson v. United States,* 913 F.2d 918 (Fed.Cir.1990); *Hoffman v. United States,* 894 F.2d 380 (Fed.Cir.1990). As the Supreme Court noted in *Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 2053, 100 L.Ed.2d 632 (1988), judicial review of constitutional questions, such as the constitutionality of a Charge to a SERB, is fully available. Even in areas considered well within the realm of the discretion of the political branches of government, discriminatory decisions affecting protected classes are subjected to scrutiny because the history of discrimination "in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis." *Miller v. Johnson,* —— U.S. ——, ——, 115 S.Ct. 2475, 2491, 132 L.Ed.2d 762 (1995) (application of strict scrutiny to race-based redistricting) (citing *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 501, 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989)).

### 2. *Count 1*

Plaintiffs contend that the Charge to the SERB violated their right to equal protection under the Due Process Clause of the Fifth Amendment. Specifically, they challenge the following section of the formal charge:

> Your evaluation of minority and women officers must clearly afford them fair and equitable consideration. Equal opportunity for all officers is an essential element of our selection system. In your evaluations of the records of minority officers and women officers, you should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization policies or practices, may have placed these officers at a disadvantage from a total career perspective. The board shall prepare for review by the Secretary and the Chief of Staff, a report of minority and female officer selections as compared to the selection rates for all officers considered by the board.

Plaintiffs assert that this language, combined with the requirement that the SERB report on the selection rates for minority/female officers, created a *de facto* race/gender quota requiring that the percentage of minority/female officers involuntarily retired be no more than the overall selection rate of the SERB. Plaintiffs further support this claim by noting that, after the completion of the SERB, the final selection rate of minority/female offi-

cers, 30.1 percent, mirrored almost exactly the overall SERB selection rate of 29.2 percent.

### 1) *Racial classification*

 The Supreme Court "has consistently repudiated '[d]istinctions between citizens solely because of their ancestry' as being 'odious to a free people whose institutions are founded upon the doctrine of equality.'" *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)). In *Adarand Constructors, Inc. v. Pena*, —— U.S. ——, ——, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995), the Supreme Court held: "[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." This ruling is consistent with the Court's view that "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *University of California Regents v. Bakke*, 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978) (Powell, J., opinion). Moreover, level of scrutiny accorded racial classifications "is not dependent on the race of those burdened or benefitted." *Croson*, 488 U.S. at 494, 109 S.Ct. at 722.

The Supreme Court has been concerned particularly about racial preferences in personnel discharge procedures. In *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), the Court examined a school district's layoff program requiring that at no time could the percentage of minorities laid off exceed the percentage of minorities in the pool of employees being considered for discharge. The Court "expressed concern over the burden that a preferential-layoffs scheme imposes on innocent parties." *Id.* at 282; *see also Sheet Metal Workers v. EEOC*, 478 U.S. 421, 481, 106 S.Ct. 3019, 3052, 92 L.Ed.2d 344 (1986) (finding district court's orders acceptable because it "will have only a marginal impact on the interests of white workers."); *United Steelworkers of Am. v. Weber*, 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979) (holding plan acceptable because it "does not require the discharge of white workers and their replacement with new black hirees.").

 For such a remedy to be constitutional, it must be narrowly tailored to serve a compelling government interest. *Adarand*, —— U.S. at ——, 115 S.Ct. at 2113. On the question of a compelling government interest, the Supreme Court has found that "[s]ocietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy[,]" when it leads to "imposing discriminatory *legal* remedies that work against innocent people." *Wygant*, 476 U.S. at 276, 106 S.Ct. at 1848. Thus, "a public employer ... must ensure that, before it embarks on an affirmative action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination." *Id.* at 277, 106 S.Ct. at 1848–49. A finding of "'pervasive, systematic, and obstinate discriminatory conduct' justif[ies] a narrowly tailored race-based remedy." *Adarand*, —— U.S. at ——, 115 S.Ct. at 2117 (quoting *United States v. Paradise*, 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987)).

 A number of issues must be considered to assess whether a race-based remedy is narrowly tailored. First, "[i]n determining whether race-conscious remedies are appropriate, we look to several factors, including the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief ... and the impact of the relief on the rights of third parties." *Paradise*, 480 U.S. at 171, 107 S.Ct. at 1066; *see also Sheet Metal Workers*, 478 U.S. at 481, 106 S.Ct. at 3052. Second, an outright numerical quota "cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing." *Croson*, 488 U.S. at 507, 109 S.Ct. at 728. As Justice O'Connor has noted: "[I]t is completely unrealistic to assume that individuals of each race will gravitate with mathematical exactitude to each employer or union absent unlawful discrimination." *Sheet Metal Workers*, 478 U.S. at

494, 106 S.Ct. at 3059 (O'Connor, J., concurring in part and dissenting in part).

■■■ Based on the standards for evaluating race-based classifications, the court must ascertain whether the Charge to the SERB qualifies as a racial classification. No doubt exists that the portion of the Charge at issue makes reference to race. It states that members of the SERB should be aware that there is a possibility that "past individual or societal attitudes, and in some instances utilization policies and practices, may have placed these officers at a disadvantage from a total career perspective." The Charge, however, did not mandate that members of the SERB consider race in discharge decisions. The Charge did not establish any quota or goal for the percentage of minorities to be discharged. The Charge did not include race in its list of factors that SERB members should consider in making separation decisions. The Charge merely cautioned members of the SERB to be aware that some minority officers may have experienced different career opportunities or may have been affected, in some way, by discrimination. In a process which the Charge itself describes as subjective, the language at issue merely asked members of the SERB to keep in mind, as one of a host of subjective considerations, the possibility that some minority officers might have undergone different experiences.

When the Supreme Court has applied strict scrutiny to racial classifications, the cases have included far more explicit and stringent requirements to focus upon race. *Adarand*, — U.S. at — — —, 115 S.Ct. at 2102–04, involved a Small Business Administration program that automatically defined minority-owned enterprises as economically disadvantaged and thus subject to certain inferences. *Croson*, 488 U.S. at 477, 109 S.Ct. at 712, dealt with a set-aside program guaranteeing that 30 percent of contracts entered into by the City of Richmond to minority business enterprises. *Bakke*, 438 U.S. at 272–77, 98 S.Ct. at 2738–42, involved

a policy of the University of California at Davis reserving 16 of 100 medical school slots for disadvantaged minority students. *Wygant*, 476 U.S. at 270, 106 S.Ct. at 1845, presented a collective bargaining agreement providing that, in the event of layoffs, individuals with the most seniority would be retained, except that at no time could the percentage of minorities laid off exceed the percentage of minority personnel employed. While it is true that the Charge in this case, like the racial classifications at issue in the above cases, mentions race, it lacks the other essential characteristics (requirements, quotas, goals, incentives) which transform the mere mention of race into a racial classification. Ultimately, the questionable provision of the Charge was nothing more than a hortative comment, advice, or reminder. It does not constitute a racial classification subject to strict scrutiny.[11]

■■■ Some aspects of the Charge, and the final results of the SERB, do create concern. First, it is curious that after the Charge's suggestion that the members of the SERB should consider any possible effects of discrimination, the following sentence stipulates: "The board shall prepare for review by the Secretary and the Chief of Staff a report of the minority and female officer selections as compared to the selection rates for all officers considered by the board." Plaintiffs contend that this reporting requirement evidences a goal, on the part of the drafters of the Charge, of achieving racial balancing in separation decisions. Although a plausible conclusion, this surmise reads too much into the reporting requirement. The Charge did not require members of the SERB to explain or justify the decisions of the SERB. The Charge did not limit the discretion of the members of the SERB to make retirement decisions based on their own best judgment. The Charge simply required reporting statistics on the discharge rates for minorities consistent with its command that minority officers must be afforded "fair and equitable

11. Defendant stresses that the Air Force's rejection of several earlier drafts of the Charge, which would have 1) required the discharge rate of minorities not to exceed the overall discharge rate for the SERB, 2) forced the SERB to explain any failure to meet this numerical goal, or 3) forced the SERB specifically to consider the race, demonstrates that the Air Force forswore such an approach.

consideration." Absent evidence of some ulterior motive served by the reporting requirement, the court cannot imply that it demonstrates a desire to achieve racial balancing. "The presumption is that government officials have acted in good faith in making their decisions. It takes almost irrefragable proof to overcome the presumption." *Gaskins v. United States,* 227 Ct.Cl. 563, 566, 652 F.2d 70 (1981).

[redacted] Second, it is troublesome that the final discharge rate for minority/women officers closely mirrors the SERB's overall selection rate. The SERB considered 2,086 colonels for discharge, 93 of whom were minorities/women. The SERB selected 28 of the 93 minority/women officers (30.1 percent) for discharge, compared to an overall selection rate for the SERB of 29.2 percent. Plaintiffs argue the similarity of these two percentages is no coincidence and reflects a policy on the part of the Air Force to ensure that the discharge rate for minorities/women officers not exceed the SERB's overall selection rate.

[redacted] The Supreme Court has ruled that when a state actor executes a racially-neutral program or applies racially neutral criteria and the action results in a disparate impact, the constitutional guarantee to equal protection is not violated solely because of that disparate impact. *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Likewise, the court cannot presume that the SERB intentionally sought to correlate the discharge rates for minorities/women to the overall discharge rate absent evidence of such an intent. Plaintiffs' arguments based on the wording of the Charge and the statistical reporting requirement do not constitute such evidence of intent. The language of the Charge, no matter how parsed out, does not require such a correlation, thus the presumption remains operative that the SERB was conducted in accord with the literal, race neutral, requirements of the Charge. *See Sanders,* 219 Ct. Cl. at 302, 594 F.2d 804. The Charge itself does not require SERB members to take race into account or to match the discharge rate for minorities/women to the overall discharge rate. This is the basis upon which the court bases its finding that the Charge does not constitute a racial classification.

Plaintiffs' failure to provide evidence of the presence of a racial classification should not be taken as an endorsement of the Air Force's drafting of the Charge or of the SERB's actions. Several aspects of the Charge and the conduct of the SERB gave the court pause. If the Charge had required a consideration of race, or if it had established racial goals and quotas, or if the Air Force was unable to explain the misleading passage in the SERB's January 13, 1992 report to the Secretary, the outcome in this case may well have been different. In the absence of such requirements, the Charge approaches the dividing line between the mere mention of race and a racial classification, but fails to cross that line. As a consequence, the Charge and the conduct of the SERB are not subject to strict scrutiny and do not violate the equal protection guarantee incorporated into the Fifth Amendment.

2) *Gender classification*

[redacted] Unlike racial classifications the Supreme Court has not applied strict scrutiny to gender classifications. Nonetheless, the "Court consistently has subjected gender-based classifications to heightened scrutiny in recognition of the real danger that government policies that professedly are based on reasonable considerations in fact may be reflective of 'archaic and overbroad' generalizations about gender. . . ." *J.E.B. v. Alabama Ex Rel. T.B.,* — U.S. —, —, 114 S.Ct. 1419, 1424, 128 L.Ed.2d 89 (1994) (quoting *Schlesinger v. Ballard,* 419 U.S. 498, 506–07, 95 S.Ct. 572, 576–77, 42 L.Ed.2d 610 (1975)). When confronted with a gender classification, a court must ask whether that "classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (quoting *Wengler v. Druggists Mut. Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980)).

If the Charge contained a gender classification, the court would apply a less stringent

standard of review to determine its validity than would be applied to a racial classification. However, for the same reasons discussed above in connection with the putative racial classification, the Charge does not exhibit a gender classification. The Charge merely suggests that members of the SERB keep in mind that female officers may have been disadvantaged, in some way, from a "total career perspective." Other than this reminder to the members of the SERB, no requirement appears that they consider the sex of officers under consideration, and no stated quota or goal appears for the number of female officers to be retained or discharged. The fact that the Charge mentions "women," standing alone, does not constitute a gender classification.[12] Plaintiffs' arguments about the reporting requirement and the similar discharge percentages are unavailing with regard to the gender classification just as they are unavailing on the issue of the racial classification.

### 3. *Count 2*

▮ Plaintiffs argue that the SERB was conducted in violation of 10 U.S.C. § 277 (1988). Section 277, entitled "Regular and reserve components: discrimination prohibited," provides: "Laws applying to both Regulars and Reserves shall be administered without discrimination—(1) among Regulars; (2) among Reserves; and (3) between Regulars and Reserves." Defendant concedes that section 277 applies to the SERB because 10 U.S.C. § 638(e)(2), pursuant to which the

SERB at issue was created, applies to both regulars and reservists.[13]

▮ The court has found that the Air Force did not discriminate unconstitutionally against plaintiffs. Absent further statutory guidance from section 277 on what that provision means when it refers to "discrimination," the court cannot imply a meaning to "discrimination" that would extend beyond the ambit of either unlawful discrimination or favorable treatment given by the SERB to either the regulars or reserves. Plaintiffs could not support their argument that the Air Force violated section 277 with any evidence other than their constitutional claim, thus failing to overcome the presumption that the Air Force executes its obligations lawfully.[14] *Sanders,* 219 Ct.Cl. at 302, 594 F.2d 804. Plaintiffs also have failed to provide any evidence that the SERB favored regulars over reserves or vice versa. The lack of a credible basis for plaintiffs' claim on this issue compels a finding that section 277 has not been violated.

### 4. *Count 3*

▮ Plaintiffs argue that the SERB was conducted in violation of 32 C.F.R. §§ 51.4(c), and 51.5(b)(5) (1994). 32 C.F.R. § 51.4(c) provides: "Discrimination that adversely affects persons or groups based on race, color, religion, gender, age, or national origin, and that is not supported legally, is contrary to good order and discipline, and is counterproductive to combat readiness and mission accomplishment. Discrimination of

12. Those cases in which the Supreme Court has applied some level of heightened scrutiny to gender classifications have involved much more rigorous gender-based standards. *See, e.g., Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979) (providing only men liable for alimony after divorce); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (allowing women to purchase nonintoxicating beer at a younger age than men); *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975) (finding women reached legal majority at a younger age than men); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) (allowing widows, not widowers, to collect Social Security survivor's benefits); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (determining spouse's dependency based upon gender of member of military claiming dependency benefits); *Reed v. Reed,* 404 U.S.

71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (involving statute that preferred men to women in selection of estate administrators).

13. In 1994 Congress repealed section 277, Pub.L. No. 103–337, § 1661(a)(2)(A), 108 Stat. 2979 (Oct. 5, 1994), and replaced it with section 10209, Pub.L. No. 103–337, § 1661(a)(1), 108 Stat. 2978 (Oct. 5, 1994), which contains exactly the same language.

14. Plaintiffs have claimed that the Air Force's stated preference for the retention of attache and security assistance officers violated section 277. However, the Air Force in a SERB can single out certain specialized positions for a retention preference. Moreover, such a preference does not involve favoring regulars over reserves or vice versa.

this nature shall not be condoned or tolerated." Under 32 C.F.R. § 51.5(b)(5) the supervisors of DOD Components are required to "[r]ewrite documents and change practices that discriminate against military personnel based on race, religion, color, gender, or national origin."

Consistent with the court's finding that the Charge to the SERB did not violate the constitutional guarantee of equal protection under the Fifth Amendment, no action of the Air Force with regard to the Charge was illegal. The Air Force is the best judge of what its own regulations require and what actions further good order and discipline. *See Martin v. OSHRC*, 499 U.S. at 150, 111 S.Ct. at 1175. Thus, the Air Force has not violated the prohibitions of 32 C.F.R. § 51.4(c). Since it has been determined that the Charge to the SERB is constitutional, the Air Force is under no obligation, pursuant to 32 C.F.R. § 51.5(b)(5), to rewrite any documents or change any of its practices.

5. *Count 4*

Plaintiffs argue that the Air Force violated 10 U.S.C. § 638(e)(2)(B)(i) because it limited the time allowed for SERB-eligible colonels to apply for early retirement and thus exempt themselves from the SERB. Section 638(e)(2)(B)(i) provides that the SERB shall not consider any officer "who has been approved for voluntary retirement under section ... 8911 of this title, or ... who is to be involuntarily retired under any provision of law during the fiscal year in which the selection board is convened or during the following fiscal year." Plaintiffs claim that section 638(e)(2)(B)(i) was violated when the Air Force limited the time within which it would accept application for early retirement to requests filed before January 2, 1992, and to be effective not later than February 1993.

Congress granted the Secretary discretion to retire active duty officers from the Air Force. 10 U.S.C. § 8911(a) (1994). This section provides: "The Secretary of the Air Force may, upon the officer's request, retire a regular or reserve commissioned officer of the Air Force who has at least 20 years of service ... at least 10 years of which have been active service as a commissioned officer." The language of the section, particularly the use of the term "may," makes clear that the Secretary exercises discretion on retirement issues. *See Andersen Consulting v. United States*, 959 F.2d 929, 932 (Fed.Cir. 1992) (using term "may" connotes permissive discretion). Section 638(e)(2)(B)(i) does not limit this discretion. It merely states that a SERB shall not consider any officer who has benefited from the Secretary's discretionary retirement decision.

The Secretary limited the time within which the Air Force would accept applications for early retirement pursuant to an Air Force Regulation ("AFR") which provides that "eligible members may apply at any time for a retirement date that is no later than 12 months from the date of the application." AFR 35–7 ¶ 3–2a (Aug. 19, 1992).[15] In the case of the FY92 SERB, the Secretary extended this time period by two months so that servicemembers could take advantage of an expected 1993 pay raise. However, at no time did the Air Force alter the rule that "approval [of retirements] is at the discretion of the Secretary." AFR 35–7, rule 1, Table 3–1. Given the fact that the Secretary retains discretion on retirement issues, under section 8911(a), and that section 638(e)(2)(B)(i) does not limit this discretion, plaintiffs' claim that implementation of the SERB violates section 638(e)(2)(B)(i) is without merit.

6. *Count 5*

Plaintiffs argue that the Air Force arbitrarily and capriciously denied them the opportunity to make an informed decision on when they would be allowed to apply for early retirement so as to exempt themselves from consideration by the SERB. This confusion was created by Congress, which, on December 5, 1991, passed title V § 503(a) of the National Defense Authorization Act for Fiscal Years 1992 and 1993, Pub.L. No. 102–

---

15. The authority to promulgate this regulation is granted in 10 U.S.C. § 8013(g)(3) (1994) (giving Secretary power to "prescribe regulations to carry out his functions, powers, and duties under this title.").

190, 150 Stat. 1290, 1355 (1991) (codified at 10 U.S.C. § 638(e)(2)(B)(i)), exempting from the SERB any officer "who has been approved for voluntary retirement." On December 6, 1991, the AFMPC transmitted a message to Air Force personnel worldwide informing them of this new provision. On December 9, 1991, the Air Force informed its personnel that application for early retirement must be received no later than January 2, 1992. Plaintiffs contend that on December 12, 1991, the Air Force revised this message, stating that applications would not be accepted prior to January 2, 1992, because of the requirements of AFR 35–7, ¶ 3–2a, which limits applications for early retirement to 12 months prior to the retirement date. However, the Air Force wanted to create an exception to this regulation so that Air Force personnel could apply earlier than January 2, 1992, and still take advantage of an expected January 1993 pay raise. This policy change was approved on December 12, 1991, and on December 16, 1991, Air Force personnel were informed that they could in fact apply for early retirement prior to January 2, 1992, and still take advantage of the expected January 1993 pay raise.

 No doubt these contradictory and confusing messages from the Air Force may have caused some angst for servicemembers considering whether to apply for early retirement to avoid the SERB. It must be noted, however, that this confusion was largely created by Congress' decision, through the adoption of section 638(e)(2)(B)(i), to provide more options for servicemembers and the Air Force's efforts to provide extra time for applications for early retirement that could take advantage of the expected January 1993 pay raise. Any confusion that these benevolent efforts may have caused is unfortunate, but, as the Supreme Court has noted, misadvice cannot form a basis for monetary relief. *Office of Personnel Management v. Richmond*, 496 U.S. 414, 424, 110 S.Ct. 2465, 2471, 110 L.Ed.2d 387 (1990). Moreover, an agency's failure to advise an employee of the ramifications of his action does not render an action involuntary. *See Williams v. Dept. of Agric.*, 832 F.2d 1259 (Fed.Cir.1987); *Gaudette v. Dept. of Transp.*, 832 F.2d 1256 (Fed.Cir.1987). This case does not really

involve a failure to advise, nor was actual misinformation given. Rather, the situation was evolving, with a new statute and modifications in regulations, all requiring disclosure to servicemembers, and all actions taken by the DOD were with an eye toward improving the options for Air Force personnel. Some confusing messages were issued, but any confusion was remedied by the clarifying December 16, 1991 message. The evidence does not support a conclusion that the Air Force arbitrarily and capriciously denied plaintiffs the opportunity to make an informed decision.

*7. Count 6*

 Plaintiffs argue that the decision to convene the SERB violated DOD Directive 1332.32, ¶ D (Jan. 22, 1982), which states: "It is the policy of the Department of Defense that the authority to select officers who are serving in the grades of lieutenant colonel or commander and colonel or captain for early retirement shall be used sparingly." Plaintiffs assert that the Air Force could have pursued other options to decrease the size of its active duty force without resorting to a SERB. However, plaintiffs have provided no support for this claim, and it must be presumed that the Secretary knew of and followed the Directive. *Sanders*, 219 Ct.Cl. at 302, 594 F.2d 804. Moreover, the Secretary is the best judge of the meaning and requirements of his own regulations. *See Martin v. OSHRC*, 499 U.S. at 150, 111 S.Ct. at 1175. This claim is dismissed due to plaintiffs' failure to provide any evidence that the DOD Directive was violated.

*8. Count 7*

Plaintiffs argue that the SERB violated DOD Directive 1332.32(e)(1), which states: "To ensure fairness in the selection process, a central board shall be convened to consider all commissioned officers, in the same grade and competitive category, whose names fall on the active duty list...." Plaintiffs contend that the Air Force has a pre-selection process because it 1) generated pre-SERB rankings of SERB-eligible officers, and 2) communicated retire messages to the SERB

based upon the rank of the officer evaluating the servicemember being considered by the SERB. In this manner, it is argued, a message indicting a desire to have a particular officer retired could be sent without checking the "separate/retire" box on the Retention Recommendation Form, and the decisions on what signals were to be sent were based on pre-selection rankings of officers. Plaintiffs assert that such a system denied them the right to be judged by a centralized board.

Plaintiffs rely on the declarations of several officers. Col. Oak DeBerg, Assistant Chief of Staff at the headquarters of Air Force Systems Command ("AFSC"), stated:

> The AFSC Command Section decided it was mandatory to 'send a signal' to the FY92 SERB identifying those colonels that the command considered the most worthy of retention. The method selected was by the endorsement level on the form. AFSC has been informed the maximum selection rate by the SERB was to be 30%. Accordingly, the last 30 to 35% of the thirty-seven colonels on the AFSC list were to receive endorsements from the vice commander, Lt. Gen. David J. Teal, while the remaining 65 to 70% were to receive endorsements from the commander, General Ronald W. Yates. In other words, the most senior officer in command would sign the endorsements on those officers the command felt should get most favorable attention, the Vice Commander would sign the endorsements on those officers being identified for selection for involuntary retirement. This plan was carried out. The AFSC representative to this FY92 SERB was to make clear to the SERB the AFSC endorsement methodology.
>
> . . . .
>
> . . . I know some form of preselection process has also been used in AFSC as well as other major Air Force commands in advance of promotion selection boards. I do not personally know whether other major Air Force Commands used this or another pre-selection procedure for the FY92 SERB. . . .

Declaration of Col. Oak DeBerg, Aug. 21, 1994, ¶¶ 2–3. Col. John R. Phillips, Director of Personnel, Plans, Systems and Readiness, Headquarters Pacific Air Force, from June 1988, to September 1, 1992, stated: "In the course of discussing the SERB rules, process, and time-lines with my boss, Colonel Harry A. White ... I was surprised to be shown an 'order of merit list' (a rank ordering from top to bottom) of all SERB eligible colonels. . . ." Declaration of Col. John R. Phillips, (undated), ¶ 1. Deputy Chief of Staff for Personnel, Gen. Billy J. Boles confirmed that the SERB considered the rank of the rating officer: "That different commands had different policies as to who signed which records, and they also had different—and even within that, you know, the purpose was to get an indication from the command as to who they recommended be retained. So whether it came from the signature levels, whether it came from phraseology, that was the purpose of asking for input, to give a meaningful input to the board." Deposition of Gen. Billy J. Boles, Sept. 1, 1995, at 41.

The instructions to the Retention Recommendation Form state:

> a. The head of management level or designated representative marks the appropriate box to concur/nonconcur with the senior rater's recommendation in block V [the senior rater's recommendation on whether to retain or retire the officer]. The head of the management level may comment only when he or she nonconcurs with the recommendation in block V (and in that situation, must comment).
>
> b. If the head of the Mgt Level or designated representative mark Nonconcur, he or she gives a copy of the form to the ratee. If head of the Mgt Level, or designated representative, nonconcur with the senior rater and recommends retirement, he or she attaches a letter reminding the officer of his or [sic] right to submit a letter to the SERB President (see Attch 2).

Attachment 2 states: "An officer eligible for consideration by a [SERB] may send a letter to the board. . . ." Plaintiffs contend: "The opportunity to know one was being recommended for retirement had two immediate benefits to the rated officer. First, that officer was given the right to submit a letter to the SERB President articulating reasons for

retention. Second, that officer could more realistically evaluate the option of avoiding the SERB by submitting a request for voluntary retirement." Plfs' Br. filed Oct. 4, 1995, at 43–44.

■ In order to ensure fairness, DOD Directive 1332.32(e)(1) establishes a right to a centralized process of SERB selection. However, this Directive does not prohibit ranking of officers or completion of the Retention Recommendation Form by officers of different ranks. It merely guarantees that the SERB, as a centralized board, will use independent judgment to determine whether to retain or retire servicemembers. Consequently, plaintiffs must demonstrate the existence of a conspiracy, between the officers completing the Retention Recommendation Forms and the members of the SERB, that infected the independence of the SERB, undermined the centralized board, and violated DOD Directive 1332.32(e)(1). Plaintiffs have presented no such evidence. Furthermore, defendant asks the court to draw a contrary inference: "The fact that some officers, and some plaintiffs, whose commands provided the highest possible recommendation to the board, were nonetheless separated, establishes that [plaintiffs'] premise is invalid." Def's Br. filed Nov. 3, 1995, at 26.

Plaintiffs make a credible argument that some kind of signaling system might deprive an officer being considered by the SERB of an opportunity to write a letter to the board or request early retirement. Such a deprivation, however, would only occur if an officer were not aware that the rank of his rating officer might send some kind of message to the SERB. It is not speculative to remark that a positive rating from a two- or three-star general could carry more weight with the SERB than a similar recommendation from a colonel. As defendant noted during argument, the messages sent by a rater are not solely "retain" or "separate/retire." A recommendation to retain can be lukewarm, just as a recommendation to discharge might be accompanied by praise for certain aspects of an officer's performance. Defendant also noted that there might be many different reasons why a particular officer rates a particular individual, from who is in the office on a particular day to who knows the most about an individual's performance. The rank of the evaluating supervisor, just like the tenor of the recommendation given an officer, sends a message to the SERB. Nonetheless, the decisions of a SERB are not invalid simply because no prior disclosure was made of all the various subtle messages that can be sent by an evaluator.

The presence of such subtle messages does not contravene DOD Directive 1332.32(e)(1) or violate the instructions for the Retention Recommendation Form. DOD Directive 1332.32(e)(1) guarantees that a centralized board determines who is to be retained or discharged. The fact that some subtle messages are sent by the rank of the supervisor who renders an evaluation does not endanger the centralized nature of the SERB board. It is true that an attachment to the instructions states: "An officer eligible for consideration by a [SERB] may send a letter to the board." However, plaintiffs have provided no evidence that this right was denied. Plaintiffs have argued, instead, that this right is less valuable if a colonel under consideration by the SERB is not aware of a message sent by the rank of his evaluator. Apart from the fact that ample reasons are apparent why an officer should be aware of such a message, there is no reason to assume, as plaintiffs urge the court, that the message is so subtle an officer under consideration cannot discern it, but so unmistakable that it determines who is separated and who is retained. Consequently, plaintiffs have failed to provide sufficient evidence that either DOD Directive 1332.32(e)(1) or the instructions for the Retention Recommendation Form were violated.

## CONCLUSION

Accordingly, based on the foregoing, plaintiffs' motion for summary judgment is denied and defendant's cross-motion is granted. Counts 1–7 of the first amended complaint are dismissed.

**IT IS SO ORDERED.**