James R. BAKER, Charles W. Baker, Jr., Jeffery L. Beran, William M. Blaesing, Paul Bolen, Robert W. Bowen Iii, Charles Brown, Jr., Ronald Bryant, Fred W. Budinger, Frederick W. Butler, Kenneth D. Clonts, Michael J. Connors, Daniel J. Coonan Iii, Robert S. Cope, Wayne D. Corder, Charles Cushion, Dale A. Davidson, Oak Deberg, Jesse C. Dehay, Jr., John C. Duncan, Jr., Edmond N. Durocher, Robert A. Eason, Jr., Matthew S. Eichinger, Richard D. Emmons, Alan Ernst, Herb Farr, Terry Fenstad, John E. Ford Iii, Mark B. Foxwell, Robert O. Freeman, James C. Gast, Jim Gerber, Michael A. Gould, Dwight K. Groggel, Jr., Donald L. Gurney, Richard G. Hetzel, Roger Hill, Ron Hudak, Hubert A. Jenneskens, Charles E. Johnson, Jr., Ralph D. Johnson, Claude S. Jones, Ben Josey, Gerhard W. Judjahn, Thomas P. Kase, David C. Kraus, John Landers, Len List, Everett L. Mabry, Joseph D. Matlock, Peter K. Maughan, Glenn Messerli, Reinaldo Morales, Wendal F. Moseley, Michael O. Mullikin, Kenneth Myers, Phillip Nicolai, Bruce R. Nyman, Carlton L. Pannell, Robert R. Pastusek, John R. Phillips, Jerry Rhyne, Monti J. Riordan, Steve B. Rogers, Arthur J. Rosenbaum, Palmer Rowe, Jr., Richard F. Salemme, Al Schmidt, John Schmidt, James Shaw, Robert F. Simpson, Rich-

ard A. Sliwka, Steve Sniteman, Lake R. Stith, William E. Townsley, Lars Vedvick, Richard L. Waxman, Jerald L. White, Merlyn J. Witt, Royce G. Wooddell, Dale B. Yonker, Henry Zabinski and Fred Zehr, Plaintiffs–Appellants,

v.

The UNITED STATES, Defendant–Appellee.

No. 96–5134.

United States Court of Appeals, Federal Circuit.

Oct. 15, 1997.

William A. Aileo, Springville, PA, argued for plaintiffs-appellants. With him on the brief was Barry P. Steinberg, Washington, DC.

John S. Groat, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, argued for defendant-appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and James M. Kinsella, Assistant Director. Of counsel on the brief was Major Joginder S. Dhillion, Department of the Air Force, Arlington, Virginia. Of counsel was Steve Pecinovsky, Department of the Air Force.

Before ARCHER, Chief Judge, CLEVENGER, and SCHALL, Circuit Judges.

CLEVENGER, Circuit Judge.

This is a military backpay case that is brought by 83 retired United States Air Force colonels. These colonels challenge their selection for retirement by a Selective Early Retirement Board (SERB) in January 1992. The basis of their complaint is that the charge given to the SERB, on its face and as applied by the members of the SERB, violated their constitutional right to equal protection of law. The gist of the constitutional complaint is the allegation that, among all colonels eligible for retirement, women and minority colonels were given preference in the selection process over male, nonminority colonels, with the result that the plaintiffs were forced to retire in the place of those to whom preference was given on account of race and/or gender.

The United States Court of Federal Claims, over the plaintiffs' objection, admitted into evidence declarations of the president of the SERB, Lieutenant General John E. Jaquish (now retired), and of an administrative officer, Lieutenant Colonel James L. Wilson, Jr. Those declarations were offered by the government to explain, among other things, how the voting members of the SERB had construed and applied the charge. In reliance on those declarations, the Court of Federal Claims granted summary judgment in favor of the government, dismissing the complaint, after concluding that the charge to the SERB members did not constitute a racial or gender classification, and that the charge as applied had not led to any favoritism to women or minority officers on account

of their status. *Baker v. United States*, 34 Fed. Cl. 645 (1995).

For the reasons set forth below, we vacate the orders of the Court of Federal Claims admitting the declarations of General Jaquish and Colonel Wilson and granting summary judgment for the United States. The case is remanded for further proceedings.

I

In August 1991, the Secretary of the Air Force decided to reduce the number of colonels in active duty as part of an effort to shrink the size of the Air Force. The Secretary acted pursuant to 10 U.S.C. § 638(a)(1) (1994), which permits selective early retirement of regular officers by a selection board convened by the Secretary under section 611(b) of Title 10 to recommend officers for early retirement.

In September 1991, a message was sent to all Air Force commands that a SERB which would convene on January 6, 1992, would select for early retirement a certain number of colonels, not to exceed 30 percent of the total potential pool of eligible officers. In order to structure the SERB for action, the Secretary approved a Retention Recommendation Form, on which officers in the chain of command would recommend "retain" or "separate/retire" for each SERB-eligible colonel. The Secretary also approved a charge to be given to the voting members of the SERB. In essence, the charge contained the orders given to the SERB, pursuant to which it would decide, from among all the eligible officers on whom rating decisions had been recommended by the chain of command, which of the colonels would be forced into early retirement.

At the time, the Air Force had previous experience with promotion boards, whose tasks had been to decide which officers, among those eligible, would be promoted to higher rank. The promotion boards also acted pursuant to charges. For the 1992 SERB, it was decided to use a charge that had been developed for use by promotion boards.

An early version of such a charge, developed at some indeterminate time before 1990, set the goal for the promotion board as being "to achieve a percentage of minority and female selections from in the promotion zone at a rate not less than the selection rate for the total number of officers in the promotion zone." *Baker*, 34 Fed. Cl. at 651 n. 4. The charge also ordered the promotion board, before adjournment, to determine if the goal had been met, and if not, to explain why. The quota requirement was deleted from the charge in June 1990, and replaced with the following language:

> You should be aware that it is possible that past personal and institutional discrimination may have disadvantaged minority and female officers. Take these factors into consideration in ensuring these officers receive truly fair and equitable treatment.

*Id.* Although no longer phrased as a commanded quota requirement, the revised charge was questioned in a Judge Advocate General legal review:

> In order to properly implement this direction, board members would be required to look behind the ratings, assignments, and PME history of each minority/female officer under consideration. If any or all of these indicia were not competitive, a board member would have to subjectively speculate if "possible personal or institutional discrimination" was responsible. If, as a result of this speculation the board member felt that the record was affected by discrimination, etc, then the member would be required to do equity and revise upward the score on the record. This is a complete and categorical reversal of the long held/mandated requirement for objective evaluation of promotion records.

II

To avoid the criticism that was leveled at the promotion board charge, further revisions were made, and language dealing with the manner in which women and minority officers were to be treated by a board was finalized in July 1990. The revised language was used in the charge to the 1992 SERB. The overall purpose of the SERB, according to its charge, was to retain in service those most qualified while eliminating 30 percent of

the colonel force. In general, the board members were instructed to make their comparative evaluations by considering the "professional competence, job performance, leadership, breadth and depth of experience, job responsibility, academic and professional education, and specific achievements" of the candidates. The section of the charge establishing the criteria to be applied when judging women and minority colonels reads:

Your evaluation of minority and women officers must clearly afford them fair and equitable consideration. Equal opportunity for all officers is an essential element of our selection system. In your evaluation of the records of minority officers and women officers, you should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization policies or practices, may have placed these officers at a disadvantage from a total career perspective. The board shall prepare for review by the Secretary and the Chief of Staff, a report of minority and female officer selections as compared to the selection rates for all officers considered by the board.

The 1992 SERB convened at Randolph Air Force Base, Texas, on January 6, 1992, and adjourned nine days later. It resulted in the selection of 610 colonels for early retirement, or 29.2 percent of the eligible pool. No female officers were selected for early retirement, and the overall percentage of minority colonels selected was 30.1 percent.

A report by the SERB concerning minority and female officer selections, as commanded by the charge, was delivered to the Secretary. Paragraph 5 of the report reads:

With your guidance concerning minorities and women specifically in mind, the board thoroughly reviewed the records of all minority and woman officers eligible for selective early retirement. The retention rates for blacks and women were better than the overall board average. The retention rate for hispanic officers was below the board average. To ensure each minority and woman officer received fair and equitable consideration, the board president carefully reviewed their records and the scoring results. Where there was any

doubt as to the competitiveness of an officer, he caused the record to be rescored to resolve the doubt. It is the judgment of the board president and the members of the board that those officers recommended for retention are the best qualified officers.

This report, dated February 11, 1992, was signed by all the voting and administrative members of the board, including General Jaquish, the president of the SERB.

### III

Colonel James R. Baker and his plaintiff colleagues filed suit in the United States Court of Federal Claims on July 13, 1994. At that time, the plaintiffs were only aware of the language of the charge, specifying the manner of treatment of women and minority officers and ordering a report on the results affecting those groups. Consequently, the complaint was filed in preliminary form, pursuant to Rule 27(a) of the Rules of the Court of Federal Claims, with a request for discovery which would enable the plaintiffs to refine their challenge to the treatment they received from the SERB. In general, the plaintiffs asked for information pertaining to the purpose of the charge, how it had been implemented, and whether the required women and minority officer selection report had been submitted to the Secretary. A series of specific questions and a request for particular documents accompanied the preliminary complaint.

The government responded to the discovery request by producing General Billy J. Boles for oral deposition on September 1, 1995. General Boles served as commander of the Air Force military personnel system and was offered as one knowledgeable in the background and reasons for the language in the 1992 SERB charge relating to minorities and women. During his deposition, General Boles described numerous situations in which women minority officers had been disadvantaged in their military careers because of their race or gender. Among those situations were the rules against women commanding a male organization and against assigning women to combat duty. With regard to minority officers, General Boles focused on black officers, stating that they generally had

been educated, before service, in universities of lesser educational status than white officers and often lacked technical training and the aptitude to qualify for pilot training. Furthermore, General Boles testified that black officers had clustered in administrative jobs, such as in equal opportunity offices or social action offices, positions which do not have the same promotion opportunity that attend jobs typically filled by nonminority officers.

General Boles stated that the situations in which women and minority officers had found themselves, during service, were to be carefully considered by SERB members in following the language of the charge. When asked if a SERB member could, in a close case between a woman or minority candidate and a male nonminority candidate, vote in favor of a woman or minority officer as a "tie breaker," General Boles admitted that such could be done under the language of the charge. However, General Boles also said that whether to break a tie in such a manner would be up to the subjective judgment of the SERB member. The General viewed the charge as a means to enforce equal opportunity for women and minority officers, and, when considered as such, he could support using the term "affirmative action" to describe the process.

Although the government agreed to produce General Boles, it otherwise opposed the plaintiffs' discovery requests. It argued that the "existing administrative record definitively establishes both that the claims plaintiffs wish to assert and that the basis upon which they assert the need for discovery lack any merit." Defendant's Opposition to Plaintiffs' July 13, 1994, Motion for Leave to Conduct Discovery, at 2. The Court of Federal Claims disagreed. In an Order dated September 23, 1994, the court noted that the administrative record did not contain pertinent information about the SERB's process. Consequently, the court ordered discovery into the "issues surrounding the 'Formal Charge' and information considered by the SERB in carrying out the charge." *See* Order filed September 23, 1994.

Based on information obtained from the discovery request, including the report of the SERB to the Secretary, which we have quoted above, the plaintiffs filed an amended complaint, renewing their constitutional challenge to the SERB and adding several counts which alleged that the SERB, by favoring women and minority officers, had violated various statutes and regulations.

Although the government initially resisted discovery into the workings of the SERB, it submitted for the record the declarations of General Jaquish and Colonel Wilson, perhaps in the light of the contemporaneous report of the SERB to the Secretary indicating that preference indeed had been accorded to women and minority officers and the emphasis of this point in the amended complaint.

The purpose of those declarations was to set the record straight or to inform the plaintiffs and the court of what had actually happened at the SERB, insofar as the consideration of women and minority officers was concerned. In urging admission of the declarations, the government thus assured the Court of Federal Claims that the declarations "establish, that, as a matter of fact, the FY1992 SERB did not consider the records of women and minority officers any differently than the baord [sic] considered the records of other officers." Defendant's Opposition to Plaintiffs' July 5, 1995, Motion to Strike, at 6.

Under penalty of perjury, General Jaquish submitted a lengthy declaration. As the president of the SERB, he noted that he was not a voting member. He noted that the SERB of which the plaintiffs complain was conducted by two panels, each composed of five voting members. The General's declaration swore, *inter alia,* to the following points:

- That the General understood the charge simply to require fair and equitable treatment for all officers, and that no particular outcome in the selection rates for women and minority officers was required by the charge, and that he believed the voting SERB members construed the charge in a like manner.

- That, during the scoring process by the voting members, but before its completion, the General was given preliminary statistics on the selection

rates for women and minority officers, but that these statistics were not, according to the declaration, "provided to, or otherwise brought to the attention of, the board members. This information did not affect in any way the SERB's deliberations and no records were rescored based on this information."

- In hindsight, the language of paragraph 5 of the report of the SERB to the Secretary did not "precisely portray[ ] the SERB's deliberations." The General did carefully, though selectively, review the records and scoring results, but apart from the automatic rescoring of the bottom 40 percent, he ordered the rescoring of only one record, that of a colonel who had been a prisoner of war.

Colonel Wilson's declaration basically reinforced the declaration of General Jaquish. Colonel Wilson, an administrative and nonvoting member of the Board, declared that the language in paragraph 5 of the SERB report had been borrowed verbatim from standard language in promotion board reports, and, although "technically correct," was not particularly accurate as a description of how the SERB functioned. Initial scoring by promotion boards is made by less than all the members of the board, and, therefore, rescoring by the other voting members of the board is often required after the board president reviews the initial results. In the 1992 SERB, however, the ten voting members had been split into two groups of five, and each group had scored every candidate during the initial process. The rescoring done by the SERB, according to Colonel Wilson, only involved the bottom 40 percent of the initially voted-upon colonels, which was done without regard to sex or race. Colonel Wilson could recall only one rescoring ordered by the president, that being of a colonel who had been a prisoner of war.

The plaintiffs moved to strike the two declarations, on the ground that they sought to change the administrative record by eliminating from the record the evidence in the SERB report to the Secretary showing some favorable treatment of women and minority officers in the form of rescoring. The Court of Federal Claims rejected that ground, characterizing the declarations instead as permissible clarifications of the administrative record. *See Baker v. United States,* 33 Fed. Cl. 810, 817 (1995).

IV

On November 9, 1995, the Court of Federal Claims conducted a hearing on the parties' cross-motions for summary judgment. At the hearing, the government sharpened General Boles's explanation of the reason for the charge and how voting members of the SERB were to apply it to women and minority officers. Citing the same examples of the lack of opportunity for women and minority officers because of past discrimination against them, the government's counsel explained that the purpose of the charge was "to give people a level playing field." When, for example, women have been denied commands or combat service, the playing field is tilted against them when they are compared to men who have experienced commands and combat service. Likewise, the playing field is not level for minority colonels, when their preservice educational backgrounds are compared to those of nonminority colonels, who may have attended the likes of Yale University, to cite the example chosen by the government. To level the playing field, one needs to "discount" the records, to use the words of government counsel, in order to afford women and minority colonels the equitable consideration required by the charge. Discounting thus amounts to the actions that were expected from the voting members of the board. Indeed, government counsel explained that the level playing field is achieved "by sensitizing the board members to the fact that they should discount this." To achieve the required equity, either the record of the woman or minority colonel would be artificially enhanced, or the record of the male, nonminority colonel, with whom the comparison was being made, would be downgraded. Thus, "discounting" would involve informal rewriting of records in order to level the imbalance existing in the actual records of the competitive population. When presented with a woman or minority officer's

record that revealed an "unlevel" playing field, the voting SERB member was expected, according to government counsel, "to call it an even cut rather than weight it one way or the other."

The government reiterated this explanation of the reason for the charge and how it should work at the oral argument in this court.

## V

Although the Court of Federal Claims expressed concern about the charge, on its face and as applied, it concluded that the charge was not a "classification" that prompted favoritism on account of race or gender: "[u]ltimately, the questionable provision of the Charge was nothing more than a hortative comment, advice, or reminder. It does not constitute a racial [or gender] classification subject to strict scrutiny." *Baker*, 34 Fed. Cl. at 656. The court reached its conclusion because the charge did not, on its face, compel a particular quota that would ensure retention of women and minority officers or actually require particular consideration of women or minority officers. Apparently minimizing the significance of the stated purpose and effect of the charge, as explained by General Boles and government counsel, the Court of Federal Claims stated at the hearing that "I thought race could be considered among other factors as long as there were no quotas." Transcript of summary judgment hearing, at 12–13 (Nov. 9, 1995). Furthermore, the Court of Federal Claims stated in its opinion that the outcome of the case "may well have been different" if the government had not provided the two declarations which assured the court that the facially troubling charge had not been applied to achieve preferential treatment of women or minority officers on account of their classification as such.

Uncomfortable, but reassured by the declarations, the Court of Federal Claims granted the government's motion for summary judgment. Notwithstanding the charge's clear urging to review the records of women and minority officers with the utmost care and to consider the disadvantages they had suffered on account of past discrimination, the court found that the charge did not rise to the level of a distinction based on race or gender for which a legal complaint could lie. The Court of Federal Claims thus did not consider whether the conduct of the SERB could be justified under the appropriate level of judicial scrutiny required to test the legality of racial or gender classifications.

## VI

Colonel Baker and his colleagues appealed to this court, arguing that it was error for the declarations to have been admitted, and, that with or without the declarations, a sufficient record had been made to show that the charge, on its face and as applied, worked an illegal, unjustifiable classification based on race and/or gender.

As we have noted above, at oral argument, the government reiterated its explanation, first by General Boles and then by the government itself at the summary judgment hearing, of what the charge was intended to accomplish and how it was to be implemented. We were also reminded by the government of the presumption of regularity, pursuant to which courts may assume that the voting SERB members faithfully performed all the tasks assigned to them. In addition, however, it was noted that the record, at this stage, does not contain any hard evidence that any of the women or minority officers that the SERB considered had records that were in need of "leveling" through the "discounting" process. In short, although the charge on its face permitted, and even encouraged, if not actually commanded, such leveling through discounting, the government assured this court that such did not happen, because the declaration of General Jaquish states that he did not believe such actions were taken by the individual voting SERB members. This assurance was given no less than seven times explicitly in the government's brief. This same assurance—that no leveling and discounting took place—was also given to us at oral argument, even though we noted to the government's counsel that General Jaquish's statements about how he thinks the individual voting board members acted is hardly reliable, given that there was no basis for General Jaquish to state what

the board members did or did not do in their own minds.

## VII

On August 13, 1997, weeks after oral argument in this appeal, the Clerk of this court received a letter from the Department of Justice. That letter attested to the government's reliance on the declaration of General Jaquish to prove the manner in which the voting SERB members had applied the charge, but further stated: "Moreover, based on all information now available, we do not represent that Lt Gen Jaquish was in a position to state the subjective interpretations of all Board members." The government requested that a copy of the letter be circulated to the members of the panel considering the case.

By withdrawing support for the declaration of General Jaquish, the government's letter has severely undermined its case. The letter also has raised a series of pertinent questions, the answers to which may well determine the outcome of the case. For example, the letter implies that additional information may have come to light that bears on the issues in the case, and that such information has undermined the reliability of General Jaquish's declaration. The letter does not explain why the government and the courts may no longer rely on at least a significant part of General Jaquish's recollections, or why it is that any part of his recollections are now reliable. Nor does the letter disclose the scope and content of the additional information which has caused the government to abandon General Jaquish or explain why such information is not within the scope of the September 23, 1994, discovery order.

In a somewhat astonishing sentence, the government's letter asserts that it is "far from clear" that inquiry into the manner in which voting SERB members applied the charge is relevant to the case. In this regard, the government is simply wrong: whether the voting members of the SERB applied the charge to work favoritism to women and minority colonels, because of their status as such, is at the heart of this case. In addition, the government's letter also asserts that it is far from clear that any inquiry into the conduct of the SERB is "legally permissible." Any basis that the government may have had to protect the workings of the SERB from discovery has already been rejected, without objection from the government, by the Court of Federal Claims in its discovery order, and, further, would seem to have been waived by the government's introduction of the two now-suspect declarations. The government opened the door into the workings of the SERB when it offered the declarations to prove that the written record, in particular paragraph 5 of the SERB's report to the Secretary, was inaccurate. In those declarations, the government stated how the individual voting members had acted. The government cannot now argue that it wishes to reveal some, but not all, of the relevant information concerning the conduct of the SERB.

Furthermore, the August 13 letter fails to explain why any more credence can be afforded to Colonel Wilson's declaration than now may be given to General Jaquish's recollections. Colonel Wilson would seem to have been in no better position than the SERB's president to know about the actual workings of the SERB.

The questions raised by the letter need to be answered. We are not the forum for a hearing to ascertain what information the government now has which may explain whether the SERB acted within the law. Nor is it for us to decide, at this time, whether additional discovery is required before the Court of Federal Claims can decide whether any declarations of General Jaquish or Colonel Wilson should be admitted, and whether, on whatever new record is made before that court, the government is still entitled to prevail.

With considerable doubt now cast on the two key declarations, the order allowing their admission must be, and hereby is, vacated. Furthermore, given the reliance on the declarations by the Court of Federal Claims in granting summary judgment to the government, and the central importance of those declarations to the government's case, the summary judgment in the government's fa-

vor cannot stand. We therefore vacate the summary judgment and remand the case for further proceedings in the Court of Federal Claims.

Costs to appellants.

*VACATED AND REMANDED.*