**Ronald ALVIN, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 99–1011 C.**

United States Court of Federal Claims.

Aug. 28, 2001.

Barry P. Steinberg, Washington, D.C., attorney of record for plaintiffs. William A. Aileo, Springfield, Pennsylvania, of counsel.

Lee J. Freedman, with whom were Assistant Attorney General David W. Ogden, Director David M. Cohen, Deputy Director James M. Kinsella, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C. Jeh C. Johnson, General Counsel, Department of Air Force and Major Jennifer Grimm, Office of the Judge Advocate General, United States Air Force, of counsel, for defendant.

## OPINION

WIESE, Judge.

This is a suit by former officers of the United States Air Force who assert that their selection for involuntary retirement (pursuant to a statutorily required reduction in force) was unlawful because it was accomplished under the guidance of instructions that impermissibly discriminated in favor of minority and female officers. Plaintiffs seek reinstatement to office with back pay.

The case is now before the court on cross-motions for summary judgment. The parties are divided on two fundamental issues: (i) whether the instructions prescribe an officer-evaluation process that violates the plaintiffs' individual rights to equal protection under the Fifth Amendment to the United States Constitution, and, if so, (ii) whether the instructions are unlawful *per se*, or are sustainable upon proof that they address a compelling governmental concern—the alleviation of past institutional prejudices against minority and female members—through a narrowly tailored remedial scheme.

We conclude that the instructions—and the evaluation process they establish—indeed deny plaintiffs equal protection under the law. We do not believe, however, that the instructions are unconstitutional *per se*, but, rather, that their lawfulness depends upon a

future showing by defendant that the instructions are narrowly tailored to achieve a compelling governmental purpose. Accordingly, defendant's motion for summary judgment and plaintiffs' cross-motion for summary judgment are denied.

## BACKGROUND

For fiscal year 1994, Congress mandated reductions in manpower throughout the military, including the Air Force. *See* Pub.L. 103–160, § 401, 107 Stat. 1639 (1993). To comply with these reductions, the Secretary of the Air Force exercised his statutory authority to convene a Fiscal Year 1994 Selective Early Retirement Board ("Board") in May 1993. *See* 10 U.S.C. §§ 611(b), 638(a)(1) (1994). Members of the Board were assigned to review the records of active duty colonels in the 1966 and 1968 promotion-year groups and, in accordance with a manpower quota set by the Secretary, to select the appropriate number of officers for early, involuntary retirement.[1]

To assist members of the Board in understanding and carrying out their responsibilities, the Secretary issued a Memorandum of Instructions dated May 17, 1993. The instructions informed Board members that they would be using the "whole person concept" to evaluate each officer's relative potential to continue productive service on active duty. This process, it was explained, involved the assessment of such factors as "job performance, professional qualities, leadership, depth and breadth of experience, job responsibility, academic and professional military education, and specific achievements."

By way of added guidance, the instructions advised:

You will be scoring the records of highly specialized officers who, because of mission requirements, may have a narrow range of duties when compared to others who have a broader range of experience. The Air Force needs both highly specialized as well as generalized officers. In addition, you should give particular consideration to officers in hard to fill requirements in security assistance and the defense attache system that require lengthy training. The Air Force is relying on your experience and mature judgment to relate all these factors in your evaluation and to retain only those officers who should remain on active duty.

Continuing, the instructions stated:

You should give due consideration to those who have gallantly served their country in unique situations such as having served honorably as prisoners of war or having been decorated for exceptional bravery. Every eligible officer must be given equal consideration for continued service.

Assess academic and professional military education accomplishments in terms of how they enhance performance and potential. Do not give disproportionate weight to the mere fact that an officer has completed advanced education. Do not consider completion of PME [professional military education] as a pass-fail requirement. The overriding factor must be job performance.

Further, the instructions cautioned Board members that:

Your evaluation of minorities and women must clearly afford them fair and equitable consideration. Equal opportunity for all officers is an essential element of our selection system. In your evaluation of the records of minorities and women, you should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization policies or practices, may have placed these officers at a disadvantage from a total career perspective.

Finally, on the same point, the instructions added "[t]he Board shall prepare for review by the Secretary and Chief of Staff, a report of minorities and women selections as com-

---

1. The 1966 and 1968 promotion-year groups at issue in this case consisted of colonels who began active-duty military careers in 1966 and 1968 respectively. The two groups were considered by the Board independently. Also, colonels in both groups had already been offered, but declined, the opportunity to retire voluntarily from active duty. The Secretary set the selection quota for involuntary retirement at thirty percent for the 1966 promotion-year group and fifteen percent for the 1968 year group.

pared to the selection rates for all officers considered by the Board."

On the basis of its evaluation of each candidate, the Board assigned a comprehensive, numerical score, which represented its subjective judgement as to the overall quality of that officer. The officers were then ordinally ranked. Beginning at the bottom of the resulting list, the Board selected the number of officers required to meet the Secretary's manpower quotas. The individuals thus identified were recommended for retirement; the rest—deemed to be the best qualified— were recommended for retention.

In accordance with the evaluation process prescribed by the instructions and the percentage reductions in personnel requirements established by the Secretary, the Board identified 84 colonels for early retirement from a selection pool of 282(30%) in the 1966 promotion-year group, and 82 colonels from a selection pool of 553(15%) in the 1968 year group. Within the 1966 selection pool, twelve colonels were non-white. Of these, one was among those selected for involuntary retirement. There were no eligible female officers. Within the 1968 selection pool, twelve colonels were non-white and seven were female. None of these individuals were selected for involuntary retirement. Plaintiffs were among those selected for early retirement.

On December 22, 1999, plaintiffs filed suit in this court claiming that their involuntary separation from active military service was accomplished in violation of law. Plaintiffs contend that as a result of the particular attention given to minority and female candidates by the Secretary's instructions, they were deprived of the opportunity to compete for retention on equal terms. Hence, their involuntary separation from military service, plaintiffs argue, amounted to a violation of their rights to equal protection. Defendant disagrees with this assertion, maintaining that the instructions, fairly read, counsel equal treatment for all candidates.

## DISCUSSION

■ The essence of an equal protection challenge is the contention that the government has acted in a manner that fails to treat similarly situated individuals equally. 3 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 18.2 (3d ed.1999). Thus, a statute or policy that explicitly distinguishes between persons on grounds of race or gender in the distribution of benefits or burdens is "inherently suspect and presumptively unconstitutional." *Fullilove v. Klutznick,* 448 U.S. 448, 523, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Stewart, J., dissenting). Congress, the Supreme Court has said, "may treat people differently because of their race only for compelling reasons." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 235, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Similarly, the Court has declared that "[p]arties who seek to defend gender-based government actions must demonstrate an 'exceedingly persuasive justification' for that action." *United States v. Virginia,* 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).

■ The question we confront in this case is whether the Secretary's instructions provide for equal treatment of all candidates competing for retention in military service or, instead, direct that special consideration be given to minority and female members.

In claiming that their involuntary separation from service was accomplished in violation of law, plaintiffs focus on that paragraph in the instructions regarding the assessment of minorities and women that reads as follows: "In your evaluation of the records of minorities and women, you should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization policies or practices, may have placed these officers at a disadvantage from a total career perspective." Plaintiffs argue that this language gave special retention consideration to minorities and women, and thereby diminished their own opportunity to compete for retention on an equal basis. Distinctions on the basis of race and gender, plaintiffs point out, trigger heightened judicial scrutiny. Plaintiffs go on to say that under such scrutiny, the classifications established in this case cannot pass constitutional muster. Thus, in plaintiffs' view, the Board's results were the product of an unlawful process that the court should now set aside.

Defendant contests these assertions. The instructions, defendant contends, do not require or encourage unequal treatment of any officer or category of officers. Rather, defendant maintains, the instructions require that all officers be treated equally, without prejudice or partiality of any kind.

As to the instructions' specific reference to race and gender, defendant contends that nothing more is required of Board members than that they provide minority and female officers fair and equitable consideration and the same equality of opportunity being extended to all officers. To achieve these goals, defendant claims that Board members have only to be "alert to any indication that past practices or attitudes may have placed a minority or female officer at a career disadvantage." Defendant denies that the instructions either contemplate or foster an enhanced evaluation of a military record based on an individual's race or gender.

We do not share defendant's view about the alleged neutrality of the instructions' language. To caution Board members—as these instructions do—about the need to remain sensitive to the potential career-limiting effects of past societal and institutional attitudes means nothing unless it intends for certain individuals to be evaluated more favorably than their records otherwise would permit. The instructions are an open invitation to speculation about career achievements that might have been realized had equal opportunity always been the guiding rule. Since plaintiffs were not accorded the benefit of a similarly favorable instruction, they were therefore placed at a disadvantage in the evaluation process because of their race and gender. Plaintiffs, in short, were denied equal protection.

We are not alone in our interpretation of the Secretary's instructions. The same instructions were before the court in *Baker v. United States*, 127 F.3d 1081 (Fed.Cir.1997).

In that case, the court of appeals was asked to overturn a trial court ruling upholding the neutrality of the instructions based in part on affidavit evidence explaining that the instructions had not been applied to achieve preferential treatment of women or minority officers. In the course of examining this issue, the court of appeals described the instructions as a "charge [that] on its face permitted, and even encouraged, if not actually commanded, such leveling [of records] by discounting [*i.e.*, minimizing the importance of competitive factors unique to white male officers.]" *Id.* at 1087.[2]

While the court of appeals used the term "leveling by discounting" to characterize the instructions' mandate, we see the instructions instead as a directive to assign minorities and women candidates higher scores despite what may be lesser records of achievement. The outcome, however, is the same: the instructions employ a double standard—one for minorities and women; the other for white male officers.

The race and gender-based distinctions reflected in the instructions can survive a constitutional challenge only if the Government is able to demonstrate that the distinctions address fundamental government concerns and do so in a manner least violative of equal protection considerations. More specifically, to pass constitutional muster, federal racial classifications must serve "a compelling governmental interest, and ... be narrowly tailored to further that interest." *Adarand*, 515 U.S. at 235, 115 S.Ct. 2097. Distinctions based on gender, by contrast, demand an "exceedingly persuasive" justification and must be "substantially related" to the achievement of their remedial objectives. *United States v. Virginia*, 518 U.S. at 533, 116 S.Ct. 2264. The burden of providing these justifications rests entirely with the Government. *Id.*[3]

---

**2.** In its brief, defendant points out that the language we have quoted from the *Baker* decision is *dicta* rather than the holding of the court. Although defendant is correct on this point, we fail to see how this distinction has any bearing on the *Baker* court's understanding of what it obviously saw as the plain meaning of the instructions' words.

**3.** The ultimate burden remains with plaintiffs to demonstrate the unconstitutionality of the instructions. *Wygant v. Jackson Board of Ed.*, 476 U.S. 267, 277–78, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986).

■ Plaintiffs contend that they are entitled to summary judgment at this stage in the proceedings because there is, in their view, no compelling governmental interest that could support the use of racial or gender considerations in a career-ending selection process. In support of this argument, plaintiffs refer us to the decision in *Wygant v. Jackson Board of Ed.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), a case in which the Supreme Court invalidated a local school board policy that extended preferential protection against job layoffs to some of its employees on the basis of their race or national origin.

In deciding that the layoff provision did not constitute a legally appropriate means for achieving even a compelling governmental purpose, the Court ruled that the burden such a policy imposed was simply "too intrusive." 476 U.S. at 283, 106 S.Ct. 1842, 90 L.Ed.2d 260. Speaking for a plurality of the Court, Justice Powell wrote:

> layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives. That burden is too intrusive. We therefore hold that, as a means of accomplishing purposes that otherwise may be legitimate, the Board's layoff plan is not sufficiently narrowly tailored. Other, less intrusive means of accomplishing similar purposes—such as the adoption of hiring goals—are available. For these reasons, the Board's selection of layoffs as the means to accomplish even a valid purpose cannot satisfy the demands of the Equal Protection Clause.

*Id.* at 283–84, 106 S.Ct. 1842 (footnotes omitted).

Plaintiffs see their career-ending separation from military service as an institutional response to past racial and gender discrimination that is indistinguishable from the disregard of individual rights that the Court struck down in *Wygant*. Plaintiffs thus argue that the Secretary is precluded as a matter of law from carrying out personnel reductions in the manner contemplated by the instructions, and must find other less intrusive means to achieve the military's personnel goals, such as enlistment and commissioning programs. On this basis, then, plaintiffs now claim they are entitled to summary judgment.

Although the argument plaintiffs make is a compelling one, we are reluctant to say—as that argument would require us to—that the Secretary has available other, less intrusive means by which to remedy the alleged past instances of race and gender discrimination in the Air Force. Courts, it must be remembered, have been instructed "that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Orloff v. Willoughby*, 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953). Keeping this admonition in mind, we think it essential, even in a case involving a right as fundamental as the right to equal protection—that we not foreclose the Secretary's opportunity to demonstrate that the instructions represent the least intrusive means by which to remedy past racial and gender discrimination.

## CONCLUSION

For the reasons stated in this opinion, the parties' cross-motions for summary judgment are denied.