PROST, Circuit Judge.
This is a military pay class action case brought on behalf of officers of the United States Air Force terminated pursuant to a 1993 Reduction in Force (“RIF”). The basis of their complaint is that the formal instructions governing selection for involuntary termination required different treatment of officers based on their race or gender, thereby violating the equal protection guarantee of the Fifth Amendment to the United States Constitution.
At issue is a portion of the Air Force Secretary’s Memorandum of Instruction (“MOI” or “Instruction”) to the Board charged with selecting officers for involuntary termination. The challenged Instruction mandated that a certain process be followed in the Board’s evaluation of minority and women officers:
Your evaluation of minority and women officers must clearly afford them fair and equitable consideration. Equal opportunity for all officers is an essential element of our selection system. In your evaluation of the records of minority and women officers, you should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization of policies or practices, may have placed these officers at a disadvantage from a total career perspective. The Board shall prepare for review by the Secretary and the Chief of Staff, a report of minority and female officer selections as compared to the selection rates for all officers considered by the Board.
Berkley v. United States, 48 Fed.Cl. 361, 365 (2000).
The United States Court of Federal Claims granted summary judgment in favor of the government, concluding that the MOI did not include a racial or gender-based classification bestowing a benefit or burden that would require heightened scrutiny by the court; Therefore, applying a rational basis rather than a strict scrutiny analysis, the court concluded that the Appellants had not been denied equal protection under the law.
We disagree. In Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), the Supreme Court held that “any person, of *1082 whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.” Id. at 224, 115 S.Ct. 2097. Because we conclude that the MOI requires differential treatment of officers based on their race or gender, it must be evaluated under a strict scrutiny analysis. In order to determine whether there has been an equal protection violation under the strict scrutiny standard, further inquiry is required to ascertain whether the racial classification serves a compelling government interest and whether it is narrowly tailored to the achievement of that goal.[1] Id. at 227, 115 S.Ct. 2097. We therefore reverse the judgment of the Court of Federal Claims and remand for further proceedings consistent with this opinion.
BACKGROUND
In July 1992, in response to congressionally mandated reductions in the Armed Forces, the Secretary of the Air Force established a “RIF” Board to select officers in the Air Force for involuntary separation in Fiscal Year 1993 (“FY93”).[2] See Berkley, 48 Fed.Cl. at 364. The Secretary provided the Board with written instructions regarding the procedures it was required to follow in evaluating officer files to determine which of those officers would be involuntarily terminated. The section of the Instruction that set forth the criteria to be applied in evaluating minority and women officers read:
In your evaluation of the records of minority and women officers, you should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization of policies or practices, may have placed these officers at a disadvantage from a total career perspective.
Id. at 365. Further, immediately following this special process to be applied in evaluating minority and women officers, the Instruction ordered the Board to “prepare for review by the Secretary [of the Air Force] and the Chief of Staff, a report of minority and female officer selections as compared to the selection rates for all officers considered by the Board.” Id.
The Appellants are members of a certified opt-in class. See Berkley v. United States, 45 Fed.Cl. 224, 235 (1999). Class members were considered and selected for involuntary separation from the United States Air Force by the FY93 RIF Board pursuant to the Instruction cited above. Berkley, 48 Fed. Cl. at 364. As a result, they filed suit against the government alleging that the RIF Board process was conducted in violation of their equal protection rights under the Constitution. Specifically, Appellants alleged that the Secretary’s imposition of mandatory written instructions expressly estabhshing specific criteria applicable only to the evaluation of the records of minority and female officers constituted a racial or gender-based classification. See id. at 365. The government defended by arguing that the Instruction was neutral on its face and did not constitute racial or gender-based clas *1083 sifications. Id. Both parties filed cross-motions for summary judgment. Id. at 366.
The Court of Federal Claims found that the plain meaning of the Secretary’s Instruction was “to guarantee equal treatment and opportunity to all those subject to review by the FY93 RIF Board, including white male, minority and women officers.” Id. at 379. The MOI, the court concluded, did not include a racial or gender-based classification bestowing a benefit or burden that would require the imposition of heightened scrutiny of governmental action by the court. See id. at 376. Thus, applying a rational basis test rather than a strict scrutiny analysis, the court held that the Appellants’ equal protection rights had not been violated and granted the government’s motion for summary judgment.
Berkley filed this timely appeal challenging the Court of Federal Claims’ grant of the government’s motion for summary judgment. We have jurisdiction over this appeal under 28 U.S.C. § 1295(a)(3).
DISCUSSION
I
This court reviews the Court of Federal Claims’ grant of summary judgment de novo. Cook v. United States, 86 F.3d 1095, 1097 (Fed.Cir.1996). Summary judgment is appropriate if there is “no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c). Therefore, after drawing all reasonable factual inferences in favor of the non-moving party, this court will affirm the Court of Federal Claims’ grant of summary judgment if no “reasonable [factfinder] could return a verdict for the nonmoving party.” EZ Dock, Inc. v. Schafer Sys., Inc., 276 F.3d 1347, 1351 (Fed.Cir.2002) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
II
The Appellants claim a violation of the equal protection guarantee of the Fifth Amendment to the Constitution. “At the heart of the Constitution’s guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.” Metro Broad. Inc. v. F.C.C., 497 U.S. 547, 602, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (O’Connor, J., dissenting);[3] see also Adarand, 515 U.S. at 229-30, 115 S.Ct. 2097 (“[Wjhenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution’s guarantee of equal protection.”); Richmond v. J.A. Croson Co., 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (“Classifications based on race carry a danger of stigmatic harm.”). The Supreme Court has unambiguously expressed its adherence to the basic principle that “ ‘[a] free people whose institutions are founded upon the doctrine of equality,’ should tolerate no retreat from the principle that government may treat people differently because of their race only for the most compelling reasons.” Adarand, 515 U.S. at 227, 115 S.Ct. 2097 (quoting Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943)).
*1084 It is also well established that “[t]o state a claim for an equal protection violation, appellants must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender.” Hayden v. Nassau, 180 F.3d 42, 48 (2d Cir.1999). Intentional discrimination, however, can be demonstrated in any one of three different ways. The first involves a facially neutral statute that violates equal protection “if it was motivated by discriminatory animus and its application results in discriminatory effect.” Id. (citing Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). The second involves a facially neutral law that violates equal protection “if it is applied in a discriminatory fashion.” Id. (citing Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). Finally, “a law or policy is discriminatory on its face if it expressly classifies persons on the basis of race or gender.”[4] Id. (citing Adarand, 515 U.S. at 213, 115 S.Ct. 2097).
Ill
This case involves the third category of intentional discrimination, presenting the issue of whether the 1993 RIF process, and namely the MOI used by the Board, expressly classified persons on the basis of race and gender, i.e., “treat[ed] any person unequally because of his or her race,” Adarand, 515 U.S. at 229-30, 115 S.Ct. 2097, or “placed persons on an unequal footing because of their race.” Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. Jacksonville, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). If we conclude that it did, a strict scrutiny analysis is required under which the government, in order to prevail, must demonstrate both a compelling governmental interest for that classification and that the Instruction was narrowly tailored to meet that interest. See Adarand, 515 U.S. at 227, 115 S.Ct. 2097.
The Appellee argues that the MOI is a facially neutral order that does not direct the use of racial or gender-based classifications and thus does not require heightened judicial scrutiny by this court. See Berkley, 48 Fed.Cl. at 361, 365. The Appellants, in contrast, contend that the MOI, on its face, clearly established a racial and gender-based classification. Id. at 369.
The Court of Federal Claims concluded that the Instruction did not classify persons based on race and gender, and that strict scrutiny was thus not applicable. It held, rather, that “[t]he Memorandum does not require Board Members to artificially raise or lower an officer’s score based on race or gender,” and therefore did not pressure the RIF Board into making race or gender-based retention decisions. Id. at 363-64. Further, the court found that the MOI neither gave minority or women officers an artificial benefit, nor burdened white male officers. Id. at 374. The mention of possible past lack of opportunity does not rise to the level of an improper classification, the court held, until it is combined with a direction to impose a benefit or burden based on that discrimination. Id.
In our view, the Court of Federal Claims’ reading and characterization of the MOI misses the mark. The Instruction at issue did not simply refer in passing to the *1085 possibility of past discrimination against minorities and women. Rather, it provided explicit orders that when the Board members reviewed the records of minority and women officers, “[it] should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization of policies or practices, may have placed these officers at a disadvantage from a total career perspective.” [5] Id. at 365. We conclude that the Instruction did require different treatment of officers under review based on their race and gender, i.e., it required— unequivocally and without exception — that white male officers be treated differently from minority and female officers.[6]
The trial court was evidently persuaded of the Secretary’s commitment to equality for all officers in other portions of the MOI, including its dictate that “[y]our evaluation of minority and women officers must clearly afford them fair and equitable consideration.”[7] Id. Appellants, on the other hand, find this provision objeetiona-ble in that this mandate for “fair and equitable consideration” referred only to evaluations of minority and women rather than all officers. In our view, the different standards and procedures required for the evaluation of minority and women, but not white male officers, do not avoid the application of strict scrutiny by the fact that they are preceded by a phrase calling for “fair and equitable consideration,” where what is meant by such consideration is defined by the different required standards. Moreover, the Court of Federal Claims discounted the significant fact that the Instruction’s dictate of special consideration for minorities and women was immediately followed by the requirement that the Board prepare a report for review by its superiors. The report, the Board was told, was to consist of a comparison of the selection rates of minority and women officers to the rates of all officers. See id. The Court of Federal Claims described this requirement simply as a report regarding “all officers considered by the Board,” and concluded that the report had *1086 no effect on the selection process because it required only the gathering of information. Berkley, 48 Fed.Cl. at 379.
Such observations and conclusions with regard to the report, however, ignore its plain language and its context. First, the report requirement immediately followed the order outlining what special consideration was to be given minority and female candidates. Second, the report was to be prepared for review by organizational superiors. Third, the Instruction did not simply ask for a report of general numbers of persons selected for termination. Rather, it required a comparison between the selection rates of minority and female officers and those of all officers. Thus, the appropriate and unavoidable reading of the reporting requirement is that it advised Board members, as they conducted their reviews pursuant to the Instruction, that their selections regarding minorities and women would be monitored for specific results. Those results involved a comparison between the selection rates for women and minorities on the one hand, and all officers on the other. In sum, the reporting requirement confirms and reinforces that the Board’s charge to give minority and female officers a different type of review from that given white male officers was a serious and specific order, the application of which would be reviewed for compliance.
IV
In order to establish the existence of a suspect racial classification, Appellants are not required to demonstrate that the MOI, as interpreted or applied, was the actual “but for” cause of their selection for involuntary termination. As the Supreme Court noted in Northeastern Florida Contractors:
When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The “injury in fact” in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of a barrier, not the ultimate inability to obtain the benefit.
508 U.S. at 666, 113 S.Ct. 2297. The government, in fact, during oral argument, conceded that if the Instruction established a racial classification on its face, no further evidence or inquiry would be required as to how it may have been interpreted or applied in order to trigger strict scrutiny analysis. As it stated, how the MOI was interpreted within the military did not matter because:
If you go to strict scrutiny, which is what [appellants] are asking for, you don’t ask how it was applied. You have to assume it was applied in a discriminatory fashion at that point. And then you ask whether the government can satisfy strict scrutiny by showing that its interest in discriminating was compelling and that process was narrowly tailored.
The United States Court of Appeals for the District of Columbia Circuit confirmed this view in Lutheran Church-Missouri Synod v. FCC, 141 F.3d 344 (D.C.Cir.1998), reh’g denied, 154 F.3d 487 (D.C.Cir.1998), reh’g en banc denied, 154 F.3d 494 (Edwards, C.J., dissenting), by its rejection of the notion that record evidence regarding how a racial classification was actually interpreted or applied was a prerequisite to strict scrutiny analysis.[8] In *1087 Lutheran, the court specifically rejected what it termed the
logical flaw in the [Federal Communications] Commission’s argument, adopted in Judge Tatel’s dissent [to the denial of the suggestions of rehearing en banc], concerning] the claim that the record includes no evidence that the Church has ever employed a racial preference in its hiring decisions. Judge Tatel argues that absent such evidence strict scrutiny is inappropriate. Yet the Commission (and presumably Judge Tatel) concedes that if the regulation explicitly imposed quotas or goals strict scrutiny should apply.
Id. at 492.[9] As the court in Lutheran Church noted, however, one would not know at the time the quota or goal was imposed whether it would necessarily cause a preferential hiring decision. Id.
It could be contended that a goal or even a quota merely reflected a nondiscriminatory hiring pattern and therefore that an employer who met the goal or quota never actually discriminated. Therefore, if evidence of actual discrimination would not be required before applying strict scrutiny in the explicit quota/goal cases, there is no logical reason why it should be required here. In truth, such an evidentiary obligation would turn equal protection analysis inside out. Once a governmental program is shown to call for racial classifications, the heavy burden to justify it shifts to the government.

Id.

Moreover, the court in Lutheran Church pointed to the fact that such an “evidentia-ry obligation is flatly inconsistent with the Supreme Court’s standing analysis in affirmative action caselaw.” Id. at 493. As the District of Columbia Circuit aptly observed, given that it is clearly sufficient for standing purposes to show that a regulation caused a non-minority litigant to be treated differently from minorities, “we cannot understand how a litigant would be required, in order to trigger strict scrutiny, to make a showing that [one] made use of a racial preference in [a] particular hiring decision.” Id. What, if any, specific concrete injury the victim may have suffered, of course, would he the subject of further analysis and would be relevant in the damages phase of such a proceeding.
V
On the question of whether the MOI in this case established a racial classification, it is clearly not necessary that an explicit numeric quota or goal has been dictated. Nor, in order to qualify as a racial classification, must a challenged regulation or instruction require or oblige someone to exercise a racial preference. As the District of Columbia Circuit stated in Lutheran Church:
[T]he degree to which the regulations require, oblige, pressure, induce, or even *1088 encourage the hiring of particular races is not the logical determinant of whether the regulation calls for a racial classification. In Adarand, the challenged regulations did not require or oblige would-be-contractors to grant a preference to minority subcontractors. Rather, the regulations provided a financial incentive to bidding contractors to grant such a preference — an incentive that contractors were free (at their economic peril) to disregard. Nonetheless, the Supreme Court treated the regulations as a racial classification, and did not even pause to consider the suggestion that the absence of a compelled racial preference makes strict scrutiny inapposite. Because the ... regulations at issue here indisputably pressure — even if they do not explicitly direct or require — stations to make race-based hiring decisions, under the logic of Adarand, they too must be subjected to strict scrutiny.
154 F.3d at 491 (citations omitted). “Although an analysis of the degree of government pressure to grant a racial preference would no doubt be significant in evaluating whether a regulation survives strict scrutiny, it is the fact of encouragement — a fact that no one denies — that makes this a racial classification.” Id. at 492.
The Ninth Circuit has also rejected the notion that rigid requirements, i.e., quotas, goals, etc., are a prerequisite to the finding of a racial classification or the triggering of strict scrutiny. In Monterey Mech. Co. v. Wilson, 125 F.3d 702 (9th Cir.1997), the court addressed the constitutionality of requiring general contractors to subcontract percentages of work to minority or female owned subcontractors, but also provided that those requirements could be met by merely showing good faith effort to comply with the goals. It concluded that “[tjhough worded in terms of goals and good faith, the statute imposes mandatory requirements with concreteness.” Id. at 711. Thus, the court held:
[W]e can find no authority, and appel-lees have cited none, for a de minimis exception to the Equal Protection Clause. The Supreme Court has held that “any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.” We conclude that there is no de minimis exception to the Equal Protection Clause. Race discrimination is never a “trifle.”
Id. at 712 (quoting Adarand, 515 U.S. at 224, 115 S.Ct. 2097) (citations omitted).
Applying a similar analysis to the MOI at issue leads us to conclude that the Instruction clearly required, on its face, that female and minority officers were to be evaluated under a different standard than white male officers. The records of the former were to be reviewed with “particular sensitivity” to the possibility that past attitudes and policies may have at some point in the officers’ careers placed them at a disadvantage. Moreover, while neither formal quotas nor actual numerical goals were set forth in the MOI, persons charged with applying this “sensitivity” were advised that their actions would be reviewed by their superiors with regard to how the selection rates of minorities and females compared to the selection rates for all officers.
We are not alone in our reading of, or our concerns with, this particular Instruction. In Baker v. United States, 127 F.3d 1081, 1087 (Fed.Cir.1997), a panel of this court confronted with an Air Force MOI regarding early retirement with the same cited language as the MOI in this case rejected the Court of Federal Claims’ eval *1089 uation of the charge as nothing more than a hortative comment, advice, or reminder.[10] Id.' Instead, this court characterized the MOI as a “charge [that] on its face permitted, and even encouraged, if not actually commanded such leveling through discounting ....”[11] Id. Similarly, in Alvin v. United States, 50 Fed.Cl. 295 (2001), the Court of Federal Claims evaluated language identical to that challenged here and in Baker, and held that such language “means nothing unless it intends for certain individuals to be evaluated more favorably than their records would otherwise permit.” Id. at 299.
Rather than giving any weight to the cited language from Baker,[12] the Court of Federal Claims sought to minimize its significance by citing more recent decisions from other courts of appeals to suggest that this court’s view, as espoused in Baker, may have been different if it had the benefit of those subsequent opinions by other circuits. See Berkley, 48 Fed.Cl. at 376 (“The Baker panel did not have the benefit of [other] Circuit Court decisions before it wrote the dicta concerning the effect of the language in the Secretary’s Memorandum.”). The cases that the court speculated would have helped the Baker panel in its analysis are: Hayden v. Nassau, 180 F.3d 42 (2d Cir.1999); Allen v. Ala. State Bd. of Educ., 164 F.3d 1347 (11th Cir.1999), vacated by joint mot. of the parties, 216 F.3d 1263 (11th Cir.2000); Raso v. Lago, 135 F.3d 11 (1st Cir.1998); Lutheran Church-Missouri Synod v. FCC, 154 F.3d 487; and Monterey Meek Co. v. Wilson, 125 F.3d 702.[13] With the benefit of that suggestion, review of the cited cases leads us to a different conclusion.
Two of the five cases cited, Hayden and Allen, do not involve express race or gender-based measures used in the allocation of governmental benefits or burdens. Instead, both deal with consent decree provisions regarding the adequacy of testing instruments. The tests themselves and their grading, as the courts in those cases made clear, were conducted without any regard to race. For example, in Allen, the decree provided that “any future certification examination would be fashioned by using a system designed to avoid an unjustifiable discriminatory impact on African-American teacher candidates.... ” Allen, 164 F.3d at 1349. Under the consent decree, the Board was permitted to develop a test for making teacher certification decisions “for African-American and white candidates alike.” Id. at 1352. According *1090 ly, the court held that “where the government does not exclude persons from the benefits based on race, but chooses to undertake outreach efforts to persons of one race, broadening the pool of applicants, but disadvantaging no one, strict scrutiny is generally inapplicable.” Id. (citing Peigh-tal v. Metro. Dade County, 26 F.3d 1545, 1557-58 (11th Cir.1994)). Similarly, Raso did not involve an express race or gender-based governmental measure. Instead, the challenge in Raso was to Department of Housing and Urban Development policies requiring unbiased access to housing. See Raso, 135 F.3d at 12-13. In sum, we do not view these post -Baker decisions by other circuits as calling into question the Baker court’s expressed views with regard to the MOI language.
VI
The government also places a great deal of emphasis on United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). It argues that because this case presents a so-called “facial challenge” to the MOI, Salerno dictates that the separated officers must prove that there is no set of circumstances under which the Memorandum, on its face, could be applied without imposing a racial or gender-based classification. In Salerno, the respondents argued that the Bail Reform Act of 1984 was unconstitutional on its face. Id. at 744, 107 S.Ct. 2095. The Supreme Court rejected their claim, stating that “[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.” Id. at 745,107 S.Ct. 2095.
With regard to the government’s Salerno argument, the Court of Federal Claims observed: (1) that the government had failed to note that the language of Salerno upon which it relied was criticized by a plurality in City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999); and (2) that the Salerno “test” was not discussed by the Supreme Court in key equal protection cases such as Adarand. Berkley, 48 Fed.Cl. at 377-78. In the end, the court declined to decide the viability of Salerno, having concluded that the MOI was facially neutral. Id. at 378. Although we too question the government’s reliance on Salerno in this case,[14] we nonetheless conclude that it is unnecessary to reach the question of its applicability at this time in light of our remand to the Court of Federal Claims.
VII
Finally, the government argues that “courts must give special deference to the *1091 military when adjudicating matters involving decisions upon composition, and constitutional rights must be viewed in light of the military’s special circumstances and need.” In urging such deference, the government relies on Woodward v. United States, 871 F.2d 1068 (Fed.Cir.1989). In Woodward, this court held that “[sjpecial deference must be given by a court to the military when adjudicating matters involving their decisions on discipline, morale, composition and the like, and a court should not substitute its views for the ‘considered professional judgment’ of the military.” Id. at 1077 (quoting Goldman v. Weinberger, 475 U.S. 503, 508, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986)). Therefore, according to the government, the trial court correctly held that deference to the military applies in this case.
We adhere to the policy of giving deference to the military for matters involving “discipline, morale,, composition and the like.” Id. Such deference, however, does not prevent or preclude our review of the Instruction in this case in light of constitutional equal protection claims raised. See Holley v. United States, 124 F.3d 1462, 1465-66 (Fed.Cir.1997). In light of our disposition here, however, and our decision to remand to the Court of Federal Claims to apply a strict scrutiny analysis, we do not reach the question of what effect, if any, deference to the military would have on the judicial application of strict scrutiny.
CONCLUSION
Because we find that the challenged Instruction included a racial and gender based classification, we conclude that the Court of Federal Claims incorrectly applied a rational basis rather than a strict scrutiny analysis to the challenged MOI. Therefore, for the reasons stated above, we reverse the grant of summary judgment and remand the case to the Court of Federal Claims for further proceedings consistent with this opinion.
COSTS
No costs.

REVERSED and REMANDED.

. Gender classifications, by contrast, require an “exceedingly persuasive” justification. United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). In this case, the Air Force would be required to show that the MOI "serves important governmental objectives and the discriminatory means employed are substantially related to the achievement of those objectives.” Id. (citations omitted). For purposes of this discussion, we refer primarily to standards applicable to racial classifications.

. The Board considered 8,923 officers and selected 1,595 for involuntary separation.

. The Court's decision in Metro Broadcasting that certain racial classifications should be treated less skeptically than others was overruled by Adarand. See Adarand, 515 U.S. at 227, 115 S.Ct. 2097.

. The dissent proposes a new and unprecedented standard as a prerequisite to the application of strict scrutiny: a factual hearing to determine the "purpose,” "design,” and "effect” of the Instruction in this case. Thus, the dissent would apply the analysis heretofore reserved for a neutral statute or regulation to a directive which explicitly calls for different treatment based on race and gender.

. While we do not reach here the question of whether the MOI could withstand challenge under strict scrutiny analysis, we are mindful of the Supreme Court’s admonition that ”[s]o-cietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy.” Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 276, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); see also Richmond v. J.A. Croson Co., 488 U.S. 469, 498, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) ("[A] generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of injury it seeks to remedy. It ‘has no logical stopping point.' ” (quoting Wy-gant, 476 U.S. at 275, 106 S.Ct. 1842)).

. The dissent expresses concern on page 5 that our holding today "will cause enormous mischief by potentially invalidating virtually any governmental directive that cautions against the perpetuation of racial discrimination against minorities and gender discrimination." It further cites the backdrop of "undisputed and indisputable discrimination within the military against racial minorities." The dissent ignores that our holding today deals only with the legal standard to be applied in an evaluation of the Instruction at hand. We do not invalidate anything here, and not only do we not foreclose a factual hearing on whether the government had a compelling interest for its Instruction, we require it. Further, the dissent should be reassured that nothing in our holding today suggests the invalidation of directives that either caution against or explicitly prohibit discrimination based on race or gender. Rather, our holding is premised on the preferential treatment the Instruction gives to race and gender.

. The MOI elsewhere provides as follows: "Each of you (the president, members, recorders, and administrative support personnel) is responsible to maintain the integrity and independence of this selection Board, and to foster the fair and equitable consideration, without prejudice or partiality, of all eligible officers.” Berkley, 48 Fed.Cl. at 365.

. Like the instant case, where the refrain of "fair and equitable consideration” appears twice in the Instruction, the regulations promulgated by the Federal Communications *1087 Commission at issue in Lutheran Church contain a similar refrain urging equal opportunity or the prohibition against discrimination at least four times. Lutheran Church, 154 F.3d at 495 (Edwards, C J., dissenting).

. The dissent argues that Lutheran Church contradicts the result reached by the majority here noting that in that case, “[ajmple evidence of record not only permitted, but also compelled, the conclusion that the exhortations in fact pressured the relevant decision-makers....” We note, however, that, as described by one of the dissenters from the denial of the suggestions of rehearing en banc, the Lutheran Church panel based its decision that the regulations at issue constituted a racial classification relying primarily on two pieces of evidence — a particular provision of the regulations and a set of processing guidelines. See Lutheran Church, 154 F.3d at 497 (Edwards, C.J., dissenting).

. Although the Court of Federal Claims explicitly recognized that the challenged language in Baker and this case are the same, it proceeded to perform its own analysis, in part, because of its view that "the balance of the words in the Memorandum in Berkley, and the instant case are not the same.” Berk-ley, 48 Fed.Cl. at 375.

. "Leveling through discounting” is the process of giving less effect to the actual records of male, nonminority officers (discounting those records) in order to "give people a level playing field.” Baker, 127 F.3d at 1086.

. The Court of Federal Claims correctly observed that the cited Baker language is dictum. Indeed, in contrast to the case at hand, at the trial court level in Baker, the government urged the admission of declarations which assured the court that the facially troubling charge had not been applied to achieve preferential treatment of minority and women. Id. at 1087. Following argument before this court, however, the government withdrew support for one of those declarations and implied that it had additional information undermining the reliability of the declaration. Given the trial court’s reliance on those declarations and the fact that the government had long made them of central importance to its case, this court remanded. Id. at 1089. The case subsequently settled. Baker v. United States, No. 94-453C, 1998 U.S. Claims LEXIS 336 (Fed.Cl. Sept. 10, 1998).

. See our earlier discussion of Monterey and Lutheran Church.

. First, while this case involves a so-called "facial challenge,” in contrast to Salerno, the challenge is of neither a legislative act nor a regulation. Rather, the challenge is simply of a Memorandum issued and applied only in one particular circumstance and to a finite, discrete, and identifiable group of persons. See Black’s Law Dictionary 223 (7th Ed. 1999) (defining "facial challenge” as "[a] claim that a statute is unconstitutional on its face — that is, that it always operates unconstitutionally”) (emphasis added). Second, in equal protection cases involving facial challenges, the Supreme Court has thus far not discussed or applied the Salerno test. See, e.g., Hayden, 180 F.3d at 48 (concluding that a federal set-aside program that on its face provided financial incentives to hire minority subcontractors was subject to strict scrutiny analysis); United States v. Virginia, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (involving the government's facial equal protection challenge to Virginia Military Institute's policy of single-sex education). Finally, even assuming arguendo that Salerno applies here, it is far from clear that its requirement would not or could not be met. Indeed, as explained above, the challenged Instruction provided— without exception — that minority and female officers were to be evaluated differently from non-minority male officers.