DYK, Circuit Judge,
dissenting.
In endorsing a facial challenge to a memorandum, and in holding that the memorandum must be assumed to dictate racial and gender discrimination without a factual hearing, the majority acts contrary to Supreme Court precedent and our own decision in Baker v. United States, 127 F.3d 1081 (Fed.Cir.1997). The majority’s approach is unsupported by any decision of the Supreme Court or any other court of appeals, and, in my view, will cause enormous mischief by potentially invalidating virtually any governmental directive that cautions against the perpetuation of racial discrimination against minorities and gender discrimination against women. I respectfully dissent.
I
The crucial question here is whether the government’s selection board actions are to be tested by strict scrutiny.[1] The rule established by Adarand Constructors, Inc. v. Pena was succinctly stated by the Su *1092 preme Court: “[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.” 515 U.S. 200, 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (emphasis added). The question here is whether the memorandum requires “equal treatment” or “unequal treatment.” The government argues, and the Court of Federal Claims agreed, that the memorandum on its face merely guarantees equal treatment, and that the government’s actions are subject to rational basis review. The plaintiffs argue, and the majority agrees, that the memorandum on its face subjects the white male officers to unequal treatment and must be judged by heightened scrutiny. I disagree with both positions because I conclude that the effect of the memorandum cannot be judged on its face.
II
At the outset, I confess being unfamiliar with the concept of a “facial” challenge to a memorandum. Although we know how a statute or regulation is perceived, there is much greater uncertainty with respect to the perception of a memorandum. The Supreme Court has expressed some concern about even facial challenges to statutes because of the inevitable tendency to render sweeping decisions without an adequate factual record. United States v. Raines, 362 U.S. 17, 21-22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). There is no support for taking this facial challenge approach to a mere memorandum where the risks of abstract adjudication are even greater.
III
The issue here must be considered against the backdrop of undisputed and indisputable discrimination within the military against racial minorities. For years the military has had policies and procedures in place designed to prevent such discrimination. See 32 C.F.R. Part 51 (2001) (initially published in the Federal Register on November 2, 1989); Department of Defense Directive 1350.2, Department of Defense Military Equal Opportunity Program (Dec. 23, 1988). Notably, since at least 1988 the military has collected data on the rates of promotion for minority and female officers to judge the effectiveness of the military’s efforts to combat discrimination. See United States General Accounting Office, Military Equal Opportunity: Certain Trends in Racial and Gender Data May Warrant Further Analysis (GAO/NSIAD-96-17, Nov. 1995) (“GAO Report”) (“To help ensure equal opportunity in the services, a 1988 DOD directive and related instruction require that the services prepare annual [reports].”). For almost a decade, Congress itself has required that the “Secretary of Defense shall carry out an annual survey to measure the state of racial, ethnic, and gender issues and discrimination among members of the Armed Forces serving on active duty....” 10 U.S.C. § 481 (2000). More recently there have been allegations of reverse discrimination within the military. See Baker, 127 F.3d at 1082; Saunders v. White, No. 99-2807 (D.D.C. Mar.4, 2002). The critical question here is whether the memorandum involved was designed to prevent further discrimination against minorities or to require unequal treatment of non-minorities.
That question cannot be answered on the face of the memorandum. It does not explicitly require or direct unequal treatment. The majority’s conclusion that it “unequivocally and without exception,” ante at 1085, dictates unequal treatment is highly speculative.[2]
*1093 There are three principal aspects of the memorandum that the majority addresses: (1) the mandate for “fair and equitable” consideration for minorities and women; (2) the requirement that the board continue to be “particularly sensitive” to past discrimination against minorities and women; and (3) the reporting requirement. First, the overall purpose of the mandate appears to be “fair and equitable” consideration. This refrain is repeated multiple times throughout the memorandum. While this language may be code for preferential treatment, it could also be intended to prevent discrimination against these groups. Only a factual hearing can provide the evidence necessary to deternaine the purpose of the language.
Second, the memorandum stated that the board members “should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization of policies or practices, may have placed these officers at a disadvantage from a total career perspective.” Memorandum of Instructions, FY93 Reduction-In-Force Board, at 2 (July 20, 1992). In my view, this language (which our earlier Baker decision found troubling — see below at pp. 1084-1085) could have at least two different meanings — either (a) that substandard performance in the military should be discounted or (b) that the board members should be careful not to let these societal attitudes and discriminatory policies continue to influence their own evaluations. Again, a factual hearing is necessary to determine the design and effect.
Third, the majority places great weight on the role of the reporting requirement. The report was to be prepared after the selection of the officers for retirement by the board. The face of the memorandum does not suggest or .establish that the report was intended to influence the choices of board members. There is no evidence that the report results were reviewed on a board-by-board or member-by-member basis, much less that the board members were evaluated or thought they would be evaluated on the basis of those statistics.[3] The reporting requirement is not clearly a form of pressure on the board to give unequal treatment; it could just as well be a measure of possible discriminatory action. The use of reports as a mechanism to check on the existence of discrimination and to prevent discrimination is well established, even in the military. See, e.g., 10 U.S.C. § 481 (2000); GAO Report.
Where such possible innocent explanations exist, the Supreme Court has almost never invalidated a statute on its face. Instead, the Court will invalidate a neutral statute on its face when the only explanation for the law is unequal treatment based on race. For example, the Court has con- *1094 eluded that “no inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute” or in “those ‘rare’ [circumstances when] statutes that, although race neutral, are, on their face, unexplainable on grounds other than race.” Shaw v. Reno, 509 U.S. 630, 642-43, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (quotation omitted); see also Gomillion v. Lightfoot, 364 U.S. 339, 341, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). Thus, “[i]f a law is racially neutral on its face, the persons challenging the law as being a racial classification must show that the law was created or maintained for a racially discriminatory purpose.” 3 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 18.4, at 267 (3d ed.1999) (emphasis added).
A factual hearing is exactly what our own prior decision in Baker required when confronted with a memorandum containing identical language. In Baker, retired male, non-minority, United States Air Force colonels challenged their selection for retirement by a Selective Early Retirement Board, urging that the memorandum given to the board violated their equal protection rights. Baker, 127 F.3d at 1082. Baker came to this court on a developed factual record. The government had submitted affidavits averring that the memorandum in that case was designed to ensure equal opportunity. On appeal the government was forced to withdraw the affidavits. Although we concluded that the memorandum “on its face permitted, and even encouraged, if not actually commanded, ... leveling through discounting [which involves artificially enhancing or downgrading the records of employees],” id. at 1087, a further factual hearing was necessary to determine the purpose and effect of the memorandum. This court identified the importance of additional fact-finding to determine the effect of the memorandum on the members of the board, stating “whether the voting members of the [board] applied the [memorandum] to work favoritism to women and minority colonels, because of their status as such, is at the heart of the case.” Id. at 1088. We then acknowledged that “[w]e are not the forum for a hearing to ascertain what information the government now has which may explain whether the [board] acted within the law,” id., and remanded for further proceedings in the Court of Federal Claims. We should do the same here.
None of the cases relied on by the majority remotely supports dispensing with a factual hearing to determine the existence of discrimination. Most of these cases explicitly provided “unequal treatment.” For example, the law in Monterey Mechanical Co. v. Wilson was a state “statute [that] require[d] general contractors to subcontract percentages of the work to minority, women, and disabled veteran owned subcontractors, or demonstrate good faith efforts to do so.” 125 F.3d 702, 704 (9th Cir.1997) (emphases added). In City of Richmond v. J.A. Croson Co., Richmond adopted an ordinance “requiring] prime contractors to whom the city awarded construction contracts to subcontract at least 30% of the dollar amount of the contract to one or more Minority Business Enterprises (MBE’s). The 30% set-aside did not apply to city contracts awarded to minority-owned prime contractors.” 488 U.S. 469, 477-78, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (citations omitted).
As the majority notes, Adarand itself involved provisions that provided an explicit financial incentive to bidding contractors to provide a preference to minority subcontractors. Ante at 1088; Adarand, 515 U.S. at 205-08, 115 S.Ct. 2097. The Small Business Act set “ ‘the Government-wide goal for participation by small business concerns owned and controlled by *1095 socially and economically disadvantaged individuals’ at ‘not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year.’” Adarand, 515 U.S. at 206, 115 S.Ct. 2097 (quoting 15 U.S.C. § 644(g)(1)). To receive these benefits, the small business was required to be at least 51% owned by individuals who qualified as socially and economically disadvantaged. Id. at 207, 115 S.Ct. 2097. The accompanying regulations, in turn, provide a presumption that blacks, Hispanics, and other members of minority groups are “socially disadvantaged.”[4] Id. at 207-08, 115 S.Ct. 2097. The government conceded that the race-based presumptions used in determining eligibility for the program benefits triggered a heightened level of scrutiny. Id. at 213, 115 S.Ct. 2097. The parties disagreed merely about the appropriate level of scrutiny. Id. The Court held that federal racial classifications are subject to strict scrutiny. Id. at 235, 115 S.Ct. 2097. But there is nothing in Adarand that changes the rules for facial challenges or the standard of proof for discrimination. Indeed, the Court, responding to the argument that the provisions for favorable treatment of the disadvantaged were subject to “the most relaxed judicial scrutiny,” id. at 212-13, 115 S.Ct. 2097, stated “[t]o the extent that the statutes and regulations involved in this case are race neutral, we agree.” Id. at 213,115 S.Ct. 2097. In other words, the Court declined to assume that the provisions for favorable treatment of the “disadvantaged” necessarily imposed a racial preference.
The majority places its primary reliance on the District of Columbia Circuit decision in Lutheran Church-Missouri Synod v. FCC, 141 F.3d 344, reh’g denied, 154 F.3d 487 (D.C.Cir.1998), a case not binding on this court, and plainly distinguishable on its facts. Lutheran Church involved an equal employment opportunity (“EEO”) regulation of the Federal Communications Commission (“FCC”). In Lutheran Church, the District of Columbia Circuit held that a regulation was subject to strict scrutiny even though it did not explicitly require unequal treatment because it pressured broadcasters to engage in unequal treatment. The conclusion as to the effect of the regulation was not, however, the result of an abstract consideration of the regulation “on its face.” Rather, the court carefully reviewed the context and impact of the regulation before concluding that pressure existed. The FCC regulatory scheme was complex, but it can be simply summarized. The FCC required that broadcasters determine whether women and minorities were “underrepresented]” in the station’s workforce when compared to the geographical area in which the station was located. If so, the station was required to undertake a variety of outreach programs. More significantly, the station was required to submit these statistics to the FCC, and such underrepresentation was one factor that might trigger “intense ... review” of the station’s renewal application, increased penalties for EEO violations, or FCC letters recommending “necessary improvements.” Lutheran Church, 141 F.3d at 353. Based on this careful and comprehensive review, the court concluded that these regulations “indisputably pressure[d]” stations to make hiring decisions that favored racial minorities, Lutheran Church, 154 F.3d at 491, and “inevitably cause[d] licensees to grant racial preferences....” Id. at 493 (opinion on denial of rehearing). On this basis, the *1096 District of Columbia Circuit concluded that strict scrutiny applied to the regulations.[5] Accord MD/DC/DE Broadcasters Ass’n v. FCC, 236 F.3d 13, 21 (D.C.Cir.2001). There is no similar record here.
When the Lutheran Church precedent is understood in context, that precedent contradicts the result reached by the majority here. Ample evidence of record not only permitted, but also compelled, the conclusion that the exhortations in fact pressured the relevant decision-makers to evaluate some individuals more favorably than others, based on race or gender. In sum, Lutheran Church does not support the court’s holding in this case. Instead, that precedent argues directly against the court’s holding. The majority’s opinion is completely without support in relevant precedent.[6]
I am not suggesting.that a litigant needs to make a showing that the board made use of a racial or gender preference in each particular retirement decision, as the majority seems to believe, and Lutheran Church expressly rejects, 154 F.3d at 493. To the contrary, I am seeking the answer to more fundamental questions. What was the impact of the memorandum in actual practice? Did it effectively pressure the board to make retirement decisions on the basis of race or gender?
After a factual hearing, the memorandum here might well be found to effectively mandate unequal treatment. If so, the government’s actions must be judged by a standard of strict or heightened scrutiny. But our role is not to assume the existence of discrimination, but to demand that a hearing be held so that the question can be confidently answered on the basis of an adequate record.
IV
In Raso v. Lago, 135 F.3d 11 (1st Cir.), cert. denied, 525 U.S. 811, 119 S.Ct. 44, 142 L.Ed.2d 34 (1998), the First Circuit aptly expressed my concern with making a sweeping judgment that places all anti-discrimination requirements in a suspect light. “Every antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under such a statute, reflect a concern with race. That does not make such enactments or actions unlawful or automatically ‘suspect’ under the Equal Protection Clause.” Id. at 16.
For the foregoing reasons, I respectfully dissent.

. The majority does not separately discuss female officers, except for in a short footnote at the beginning of the opinion. The standard is, of course, different — applying only intermediate scrutiny to gender classifications, requiring an important governmental objective and a means substantially related to achievement of that objective. See United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). Like the majority, I focus on racial discrimination issues.

. The majority states:
[T]he [memorandum] clearly required, on its face, that female and minority officers *1093 were to be evaluated under a different standard than white male officers. The records of the former were to be reviewed with “particular sensitivity” to the possibility that past attitudes and policies may have at some point in the officers' careers placed them at a disadvantage. Moreover, while neither formal quotas nor actual numeñcal goals were set forth in the [memorandum], persons charged with applying this “sensitivity” were advised that their actions would be reviewed by their superiors with regard to how the selection rates of minorities and females compared to the selection rates for all officers.
Ante at 1088 (emphases added).

. The memorandum even requires each board member to certify that he or she was "not subject to or aware of any censure, reprimand, or admonishment about the recommendations of the board or the exercise of any lawful function within the authorized discretion of the board.” Memorandum of Instructions, FY93 Reduction-In-Force Board, at 5 (July 20, 1992).

. One of the programs may have also created a presumption of "economic disadvantage” for minority groups. Adarand, 515 U.S. at 207-08, 115 S.Ct. 2097.

. The majority in Lutheran Church specifically rejected the suggestion of then-Chief Judge Edwards that pressure alone was insufficient, and racial discrimination could not be established unless the government imposed an "obligation or requirement.” 154 F.3d at 491-92. Likewise, the court rejected Judge Tatel’s suggestion that the evidence of pressure was insufficient, finding that this suggestion “blink[ed] reality” in light of the record. Id. at 491. I fail to see how this rejection, of the positions of the dissenters from the denial of rehearing en banc in Lutheran Church helps the majority here.

. The Court of Federal Claims’ decision in Alvin v. United States, 50 Fed.Cl. 295 (2001), is, of course, not binding on this court.